Charles W. IRELAND and Carolyn P. Ireland, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

No. 78–3689.

United States Court of Appeals, Fifth Circuit.

July 15, 1980.

---

W. Bew White, Jr., Warren B. Lightfoot, Judith T. Veal, Birmingham, Ala., for plaintiffs-appellants.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Chief, App. Sec., Gary R. Allen, Philip I. Brennan, Donald B. Susswein, Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before AINSWORTH and GEE, Circuit Judges, and HUNTER *, District Judge.

AINSWORTH, Circuit Judge:

Appellant Charles W. Ireland[1] ("Ireland") used aircraft provided by his company to travel between his home and the firm's headquarters. The Internal Revenue Service ("IRS") assessed additional income to Ireland in the amount of the alleged value of the plane rides. After paying the resulting deficiency, Ireland brought suit in district court seeking a refund. The district court upheld the assessment and denied the refund. Ireland therefore appeals. We affirm the district court's holding that the value of the plane trips is taxable income to Ireland, but disagree, however, with the method used by the IRS and adopted by the district court in calculating the value. Accordingly, we remand for further proceedings in that regard.

Ireland was employed by Birmingham Slag Company in 1939. Virtually all of the stock in the company was owned by members of appellant's family. Working his way through the corporate ladder, appellant became the president of the firm in 1951. In 1956, Birmingham Slag merged with Vulcan Detinning Company to form Vulcan Material Company ("Vulcan"), with Ireland as its president. Since the merger, Vulcan has been a publicly held corporation with its principal office in Birmingham, Alabama.

The formation of Vulcan signalled the start of a series of corporate acquisitions. In 1957, Vulcan merged with eight separate concerns, seven of which were family-owned operations. Instrumental in negotiating the acquisitions was Bernard A. Monaghan, a private attorney practicing in Birmingham. In 1958, Vulcan hired Monaghan as its executive vice-president.

The newly-acquired companies operated as corporate divisions of Vulcan, with the former owners being retained as division heads. The process of assimilation of the new concerns resulted in certain difficulties. In that regard, Vulcan hired the firm of Rorher, Hibler & Replogle, specialists in industrial psychology, to assist in the organization of the corporation. The firm assigned Dr. Robert C. Bleke to evaluate Vulcan's operations and personnel.

In 1958, following the retirement of the division head in Chicago, Ireland moved to Chicago to supervise the daily operations of that division. While there, Ireland became the chairman of Vulcan's Board of Directors while Monaghan was named president. Following the hiring of a new division head for the Chicago operation, Ireland returned to Birmingham in 1960. At this point, personal differences arose between Ireland and Monaghan relating to various corporate policies. Monaghan preferred a "by the book" approach to business problems whereas Ireland operated in more informal ways. Management personnel, angered by Monaghan's policies, bypassed the corporate chain of command by bringing their problems directly to Ireland. The conflict created unrest within the firm and

---

* District Judge of the Western District of Louisiana, sitting by designation.

1. Suit was also filed by Ireland's wife by virtue of the fact that they filed a joint return. Since the case only involves Mr. Ireland's activities, we refer in text only to him.

interfered with the efficient operation of the company.

In 1965, Dr. Bleke was consulted in an attempt to resolve the deleterious effect of conflict between Ireland and Monaghan. He concluded that the respective corporate duties of both men needed to be more sharply defined. Specifically, he suggested that Monaghan be given sole control over the company's daily operations leaving Ireland to concentrate on the development of Vulcan's long-range policies. In order to implement the plan, Dr. Bleke suggested that Ireland physically remove himself from Vulcan's Birmingham office. The separation would make Ireland less accessible to Vulcan's management personnel thereby forcing them to deal directly with Monaghan.

Ireland moved from Birmingham to Lynn Haven, Florida, in 1965, to a home owned by his wife. After the move, Vulcan paid for his long-distance calls to the Birmingham office as well as the cost of office supplies used in conjunction with a business office maintained in appellant's Lynn Haven home.

While in Lynn Haven, Ireland had frequent occasion to travel to Birmingham in order to attend meetings of the executive committee or the Board of Directors. Ireland also traveled to various other locations in conjunction with certain business deals including a major merger negotiation conducted in 1970 between Vulcan and Kerr-McGee Chemical Corporation. Whenever Ireland desired, the company would arrange for one of its airplanes to fly to Panama City, the nearest airport to Lynn Haven, to pick up Ireland. The cost of these flights was borne by Vulcan. On occasion, Ireland's family or friends would travel with him on the flights on a space-available basis.

Appellant filed a timely return for the 1970 tax year, but reported no income by virtue of the value of the flights provided by Vulcan. The IRS audited his return in 1972 and made an adjustment totaling $993.25 which was paid by Ireland.[2] During a subsequent examination of Vulcan's corporate records and returns, the IRS became aware of Ireland's trips. Accordingly, the IRS notified Ireland that it possessed information possibly affecting his income tax liability for 1970. Eventually, a deficiency of $42,055.59 was assessed against appellant.[3] Ireland paid the amount, and filed a claim with the IRS for a refund. After the claim was denied, Ireland brought this suit in district court seeking a refund. The district court, sitting without a jury, upheld the assessment[4] and denied a refund.

Ireland raises two issues on appeal. First, he challenges the district court's finding that the value of the airplane flights provided by Vulcan constituted income to him. Ireland contends that the flights were not regular commuting expenses because he was forced to move to Lynn Haven in order to solve the management crisis resulting from his personal conflict with Monaghan. Assuming the district court was correct on the first issue, Ireland also argues that the method of determining the value of the flights was improper. We address these issues in order.

## THE VALUE OF THE FLIGHTS AS INCOME

Section 61 of the Internal Revenue Code defines gross income to include "all income from whatever source derived . . . ." 26 U.S.C. § 61(a). The concept of income under section 61 is broad given Congress' desire to "tax all gains except those specifically exempted." *Commission-*

---

2. The adjustment made in 1972 is not involved in this case.

3. The IRS determined that the value of the flights totaled $48,975.32. That figure resulted in $35,139.79 of unpaid taxes together with interest on that amount of $6,915.80 to account for the $42,055.59 assessment.

4. The district court found that certain of the flights were not personal in nature, and therefore ordered a refund of $1,335.72 together with interest. The Government did not appeal this determination, so the finding is not presented for review.

*er v. Glenshaw Glass Co.*, 248 U.S. 426, 429–30, 75 S.Ct. 473, 476, 99 L.Ed. 483 (1955). *See Commissioner v. Jacobsen*, 336 U.S. 28, 49, 69 S.Ct. 358, 369, 93 L.Ed. 477 (1949). The district court found that the value of the airplane flights constituted either a constructive dividend or additional income to Ireland and as such was taxable as income within the meaning of section 61. Under section 61(a)(7), gross income includes the receipt of any dividend. A dividend under the Code is "any distribution of property made by a corporation to its shareholders." 26 U.S.C. § 316(a). There is no requirement that the dividend be formally declared or even intended by the corporation. *Loftin and Woodard, Inc. v. United States*, 577 F.2d 1206, 1214 (5th Cir. 1978); *Crosby v. United States*, 496 F.2d 1384, 1388 (5th Cir. 1974). Accordingly, an expenditure made by a corporation for the personal benefit of a stockholder, or the use by the shareholder of corporate-owned facilities for his personal benefit, may result in the taxpayer being found to have received a constructive dividend. *See, e. g., Commissioner v. Riss*, 374 F.2d 161, 170 (8th Cir. 1967) (taxpayer's use of company-owned automobile); *Nicholls, North, Buse Co. v. Commissioner*, 56 T.C. 1225 (1971) (use of boat purchased by company and used by taxpayer's son for predominantly personal purposes); *International Artists, Ltd. v. Commissioner*, 55 T.C. 94, 105–08 (1970) (use of residence provided by corporation). *See also Old Colony Trust Co. v. Commissioner*, 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918 (1929) (payment of taxes by corporation constitutes additional income to taxpayer).

■ In determining whether a constructive dividend has been made, "[t]he crucial concept . . . is that the corporation conferred an economic benefit on the stockholder without expectation of repayment." *United States v. Smith*, 418 F.2d 589, 593 (5th Cir. 1969). *See United States v. Gotcher*, 401 F.2d 118 (5th Cir. 1968). Of course, economic benefit per se is not the only factor determining taxability. In order for a company-provided benefit to be treated as income, the item must primarily benefit taxpayer's personal interests as opposed to the business interests of the corporation. *Loftin and Woodard, supra*, 577 F.2d at 1215–17; *Gotcher, supra*, 401 F.2d at 121. The district court found that the airplane flights between Panama City and Birmingham were in the nature of commuting expenses and therefore the flights primarily served Ireland's personal interests.

■ It is established that a taxpayer's commuting costs are an item of personal expense and cannot be deducted as business expenses under section 162, 26 U.S.C. § 162. *Fausner v. Commissioner*, 413 U.S. 838, 93 S.Ct. 2820, 37 L.Ed. 996 (1973). *See Steinhort v. Commissioner*, 335 F.2d 496, 503 (5th Cir. 1964) ("[d]eeply ingrained in the whole tax structure . . . is the basic proposition that the cost of going to and from home and an established place of business is a nondeductible personal expenditure"). *See generally Sanders v. Commissioner*, 439 F.2d 296 (9th Cir.), *cert. denied*, 404 U.S. 864, 92 S.Ct. 55, 30 L.Ed.2d 108 (1971). To be sure, there are limited exceptions to this principle such as where state law requires a judge to live in one district but to hold court elsewhere in which case traveling expenses are properly deductible. *See United States v. Le Blanc*, 278 F.2d 571 (5th Cir. 1960). Of course, such expenses would not be deductible if the judge chose to live in another district as a matter of personal choice. *See Barnhill v. Commissioner*, 148 F.2d 913 (4th Cir. 1945).

Our consideration of the nature of the traveling expenses incurred in the present case is aided by the Supreme Court's landmark decision in *Commissioner v. Flowers*, 326 U.S. 465, 66 S.Ct. 250, 90 L.Ed. 203 (1946). In *Flowers*, the taxpayer was an attorney practicing in Jackson, Mississippi. He received an offer of employment from a railroad company located in Mobile, Alabama. He accepted the position with an understanding that he would continue to reside in Jackson where he had an established home and community of friends. Thereafter, Flowers lived in Jackson, but traveled to Mobile frequently. He sought to deduct the costs of commuting between

Jackson and Mobile. The Supreme Court denied the deduction. Focusing on the business purpose for his living arrangement, the Court noted that Flowers' decision to reside in Jackson served no interest of the railroad company, but reflected only his personal preferences. "Whether he maintained one abode or two, whether he traveled three blocks or three hundred miles to work, the nature of these expenditures remained the same." *Flowers, supra,* 326 U.S. at 473, 66 S.Ct. at 254. Since the costs occasioned by Flowers' lengthy commute did not aid the corporation, the expense was personal and not deductible.

■ The threshold question presented in this case is somewhat different from that posed in *Flowers*. Here, we first must determine whether the value of flights provided by a company can be included in income under section 61, whereas in *Flowers*, the Court considered the deductibility of traveling expenses incurred by the taxpayer. Despite the different focus, both questions turn on the nature of the traveling expense. The Court in *Flowers* held that if traveling expenses were personal, no deduction was permitted. Similarly, if a company provides facilities that allow a taxpayer to avoid incurring an otherwise personal expense, then the value of the services rendered must be included in income in the absence of an overriding business purpose. *Flowers* necessarily determined that traveling expenses such as those encountered in that case are personal. As items of personal expense, *Flowers* implicitly holds that they cannot be provided directly by a company, in the absence of a business purpose, without the taxpayer including in income the value received.

Appellant does not disagree with the principle that a taxpayer's use of company-provided facilities for personal commuting should be included in income. Rather, Ireland seeks to distinguish *Flowers* by arguing that his decision to reside in Lynn Haven was based on business reasons. Specifically, Ireland contends that he moved on the advice of Dr. Bleke in order to serve Vulcan's interests in having him physically separated from Monaghan.[5] The district court acknowledged the relevancy of Vulcan's interest in the separation, but rejected it as the basis of appellant's move. While Dr. Bleke recommended separation, he did not specifically suggest that Ireland move to Lynn Haven. Accordingly, the district court found that Vulcan's corporate interest could have been equally well served by Ireland "establishing an office in his home in Birmingham and instructing subordinate company officials to communicate with Monaghan and not with [Ireland]." Under this view, Ireland's move to Lynn Haven was based on personal concerns so that the increase in traveling costs was also personal, as in *Flowers*.

■ As the Supreme Court stated in *Flowers*, the question whether an expense is personal or business is one of fact, *Flowers*, 326 U.S. at 470, 66 S.Ct. at 252, and we therefore review the district court's findings under the clearly erroneous standard. *Loftin and Woodard, supra,* 577 F.2d at 1215. *See Curtis v. Commissioner,* 449 F.2d 225, 227 (5th Cir. 1971). We also note that Ireland had the burden of proving that the IRS' assessment was inaccurate. *Riss, supra,* 374 F.2d at 166.

Appellant's reliance on Dr. Bleke's recommendation is misplaced. To be sure, Dr. Bleke suggested physical separation, but he did not specifically mention that Ireland move to a distant city. Mere physical separation from the main Birmingham office was only one aspect of Dr. Bleke's advice; the key to his analysis was actually the

---

5. Ireland also relies on the fact that other officers of Vulcan lived away from Birmingham. This argument is unpersuasive since the others lived in places where Vulcan maintained plant facilities and the officers exercised supervisory responsibilities over those facilities. As such, there was a clear business reason for the living arrangements.

At the time of Ireland's move, Vulcan had a concrete pipe and cement plant in Panama City, near Lynn Haven. The proximity of the concrete plant, however, played no part in Ireland's decision to move. He never supervised operations at the plant. In 1967, the Panama City plant was sold to its employees.

separation of business functions between Ireland and Monaghan. Even in Lynn Haven, Ireland could have violated the spirit of the advice by interfering in the day-to-day operations of the company through telephone communications.

Even assuming that Ireland's move to Lynn Haven could be considered to fall within Dr. Bleke's recommendation, there is no evidence in the record indicating that Vulcan officials participated in the decision. The Board of Directors never considered the move or resolved that such an action would be in the best interests of the company.[6] On the basis of the evidence presented, it cannot be said that Ireland was directed by Vulcan to leave Birmingham. Any conclusion of business purpose in this regard is pure surmise. Accordingly, the record adequately supports the district court's finding that the move, while indirectly benefitting Vulcan, was primarily personal in nature so that the transportation expenses between Lynn Haven and Birmingham were personal, as was the case in *Flowers*. Therefore, the value of the company-provided flights was properly included in Ireland's income for the 1970 tax year.

## VALUING THE FLIGHTS

Having resolved the threshold question, we now must consider whether the district court properly determined the value of the flights. As an initial matter, we note that the parties agree on the basic principle controlling the determination of value. As the Government states in its brief, "the amount of income attributable to taxpayer by reason of his personal use of the corporate aircraft is measured by the fair market value of obtaining similar serv-

ices or facilities in an arms-length transaction in the open market." (Appellee's brief, p. 20) In light of the acknowledged standard, it is surprising that the IRS chose to base its measure not on the fair market value of some comparable service, but on an allocable portion of the total cost of operating Vulcan's air fleet. Specifically, the IRS first determined the total cost of operating Vulcan's entire fleet, including charges for depreciation, during 1970. That figure was divided by the total number of miles flown by Vulcan's planes to arrive at a cost per mile figure. The IRS calculated its assessment of value by multiplying the number of miles Ireland flew for personal trips by the cost per mile figure.

The Government's position is that the total cost method based on the corporation's costs of operating its airplanes is an adequate measure of value, and that Ireland did not introduce sufficient evidence of superior alternative methods of valuation to overcome the presumptive correctness of the IRS method. It is clear, however, that the total cost approach is not the preferred approach. Fair market value of the services received is the overriding concept in the measurement of a constructive dividend and "[t]he equation of value with costs, is therefore, not the norm but the exception." *Loftin and Woodard, supra,* 577 F.2d at 1223.

Despite the preference for a fair market value approach, the taxpayer has the burden of proving that the assessment was incorrect. *Loftin and Woodard, supra,* 577 F.2d at 1223; *Heyman v. United States,* 497 F.2d 121 (5th Cir. 1974). At trial, Ireland introduced competent evidence demonstrating the cost of charter air service.[7] Specifically, appellant introduced an exhibit showing charter rates from six different

6. An official determination by the Board of Directors would not necessarily establish the business purpose of the move as a matter of law. It would, however, be evidence of the underlying business purpose, so that the absence of an official action is evidence of the personal nature of the move.

7. Ireland also introduced evidence demonstrating two other methods of computing value. Evidence showing commercial airfare from

Panama City to Birmingham on Southern Airways was introduced. Also, Ireland introduced evidence concerning alternative ways to calculate Vulcan's costs in operating the fleet, such as by using only variable operating costs. At oral argument, counsel for Ireland acknowledged that the charter service alternative was the most clearly comparable to the company-provided flights. Since we agree with that position, we do not address the merits of the other methods of calculating the value.

companies including mileage rates, hourly charges, deadhead charges, overnight rates, as well as discounts available for volume customers. Moreover, W. R. Sowell, owner of a charter airplane company in Panama City, testified as to various rates and conditions of charter service between Birmingham and Panama City.

The Government contends that charter air service is not comparable to the company-provided flights. The Government presents a number of factors showing the differences between the two. First, the company planes were "on-call" and could be obtained by Ireland with little prior notice. Second, the charter service did not have the same "aura of distinction" that one could achieve by traveling on company planes. Third, the planes available for charter were not necessarily of the same quality as Vulcan's planes especially since the company occasionally provided Ireland with the use of its Lear jet. Finally, Vulcan's planes, in accordance with company policy, had two pilots to minimize the risk of accidents, whereas charter planes would have been piloted by a single person. The Government contends that these points when considered together create a sufficient distinction to require a finding that charter flights were not comparable to the company-provided trips.

We believe that the Government's argument too narrowly construes the concept of comparability. While the factors enumerated above are relevant in determining whether charter service is similar to company-provided flights, the analysis ignores the more fundamental aspects of the quality of service rendered to Ireland. The general nature of the service was air transportation in a private airplane at a time and place determined by Ireland. Certainly, the type of transportation afforded Ireland differs qualitatively from commercial passenger flights where service is limited to a few predetermined flights. Yet, charter service adequately falls within the guidelines mentioned above. The key attribute of charter service is its availability at a time and place dictated by the customer. Of course, exceptional business demand may reduce the availability in particular instances, but that fact does not alter the underlying nature of the charter service.

The differences described by the Government are not significant. It is doubtful that Ireland received much tangible benefit from having two pilots, nor can it be said that there is any substantial value as between different types of private planes under the facts of this case.[8] As stated above, Ireland would usually have had the benefit of having a plane "on-call" if he used a charter service. Finally, while appellant may have received some intangible benefit from using a company plane in terms of higher status, we do not find this ephemeral distinction decisive. Certainly, the ability of a taxpayer to charter a private plane to commute to work possesses a degree of status on its own account.

Our analysis is underscored by a brief consideration of the inequities in the Government's model. By basing its calculation on Vulcan's total cost of operating the airplanes, the model ties the determination of value to an arbitrary figure. Much of the total cost figure is a charge for certain fixed costs such as depreciation. The fixed costs allocable to Ireland's personal trips would depend on the total use of Vulcan's planes in any given year. Thus, in a year with heavy business travel, Ireland's share of the fixed costs would be lower than in a year with less business travel. This variation has no basis in any commercial reality or actual value to Ireland. While such an inequity might be acceptable in circumstances with no readily acceptable compara-

---

8. This point is especially true in light of the facts of this case. The "commute" was not particularly long, and thus jet service would not provide any great savings of time. Moreover, Vulcan did not obtain its Lear jet until late in the year, so Ireland did not have use of the jet predominantly or exclusively as opposed to the propeller-driven planes. We do not hold that the differences in plane type can never be sufficiently great to exclude some alternative form of comparability. We merely hold that in this case, the Government has not shown the differences to be significant once Ireland met his burden of showing the comparability of the charter service.

ble service, this is not the situation in this case. Clearly, the charter rate would be a more precise measure of value. A judicially determined figure for charter service would include both the operating costs of the flight plus a commercially reasonable figure for overhead since it could be assumed that a fair charter rate would include all the true costs of operating the plane.

The IRS' mandate in this case is only to assess a reasonable amount of taxes based on the approximate value of the services rendered to Ireland by Vulcan. Determination of that value is not capable of mathematical exactitude, and reasonableness should play a prominent role. We hold that Ireland presented sufficient evidence demonstrating the inherent comparability of charter air flights to the services provided by Vulcan. Value of the flights should properly have been based on a comparison with existing charter rates in the year in question. We remand the determination of value so that the district court can assess the evidence and arrive at a proper figure for the value.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.