WEBER ELECTRIC, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ROBERT J. LOOSE AND ROSE MARIE LOOSE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Weber Electric, Inc. v. Commissioner
Docket Nos. 21482-82, 21545-82.
United States Tax Court
T.C. Memo 1986-351; 1986 Tax Ct. Memo LEXIS 259; 52 T.C.M. (CCH) 62; T.C.M. (RIA) 86351; August 5, 1986. Neil J. Driscoll, for the petitioners. Randal E. Heath, for the respondent. *261 PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes and a section 6651(a) [1] addition to tax as follows: Addition to Tax
Taxpayer
Year
Deficiency
Sec. 6651(a)
Weber Electric, Inc.
1980
$2,181.00
$109.05
Robert J. Loose and
1979
3,664.90
Rose Marie Loose
1980
600.00
*262 The issues for decision are: (1) Whether petitioner Weber Electric, Inc., is entitled to include in its cost of goods sold certain electrical supplies and materials purchased from its sole stockholder, petitioner Robert J. Loose, and, if so, in what amount; (2) Whether petitioner Robert J. Loose had unreported income from the sale of the electrical supplies and materials to his wholly owned corporation and, if so, in what amount; (3) Whether petitioner Weber Electric, Inc., is entitled to deduct as cost of goods sold or as a business expense two minor amounts disallowed by respondent; and (4) Whether petitioner Robert J. Loose had constructive dividend income as a result of personal usage of a corporate automobile in 1979 and 1980. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits thereto are incorporated herein by this reference. Weber Electric Company, Inc., was incorporated under the laws of the State of Oregon. Its principal office was located in Scappoose, Oregon at the time it filed its petition in this case. The corporation is an accrual basis taxpayer and reports its income on the basis of a fiscal *263 year ending June 30. It filed its Federal corporate income tax return (Form 1120) on January 2, 1981, for its fiscal year ended June 30, 1980, with the Internal Revenue Service Center in Ogden, Utah. [2]
Petitioners Robert J. Loose and Rose Marie Loose (hereinafter Mr. and Mrs. Loose or the individual petitioners), husband and wife, resided in Portland, Oregon at the time they filed their petition in this case. They are cash method taxpayers and report their income taxes on the calendar year basis. They filed their joint 1979 and 1980 Federal income tax returns (Forms 1040) with the Internal Revenue Service. Weber Electric, Inc. (hereinafter the corporation or the corporate petitioner) was incorporated by James Weber (Mr. Weber) around July 1, 1979. Prior to *264 incorporating, Mr. Weber had operated the business as a sole proprietorship, and Mr. Loose and his son, Mark, and worked for him. In 1979 Mr. Weber was in the process of getting a divorce and wanted to sell his business. Mr. Loose, a licensed electrician for over 32 years, was interested in acquiring the business, but there was some question as to whether his union would allow him to operate such a business other than in corporate form. For that reason Mr. Weber had the business incorporated, and Mr. Loose purchased the outstanding stock of the corporation from Mr. Weber on or about July 1, 1979. While actual transfer of the stock was not made until August 8, 1979, control of the corporation was transferred to Mr. Loose on or about July 1, 1979. At all times thereafter relevant to this case, Mr. Loose was the president and the sole stockholder of the corporation. [3]
Shortly after purchasing the outstanding stock, Mr. Loose transferred to the corporate petitioner various electrical supplies and materials that he had *265 acquired and accumulated from 1975 to 1979 and that he had kept stored in his garage. [4] Mr. Loose had not kept any running inventory or other contemporaneous record as he accumulated these items and did not have any receipts or other documentation for the items. Mr. Loose had only four receipts or invoices for purchases totaling $1,134.52, but two of those purchases were in 1971 and 1972 and the other two, in 1975, could not be identified with any items transferred to the corporation in 1979. *266 At some point a list was prepared that included a general description and the quantity of items purportedly transferred. The Court cannot find that this list was prepared contemporaneously with the transfer of the items to the corporation or in fact represents what was actually transferred to the corporation. [5] The cost figures were not placed on the list until William Holdner, the corporation's certified public accountant, started preparing the company's corporate tax return for the fiscal year ended June 30, 1980. *267 Mr. Holdner did not perform any accounting services for the corporation until early March 1980. When Mr. Holdner first recived the above list of items, sometime after June 30, 1980, it did not contain any prices. By that time most of the items transferred to the corporation had already been used on jobs and were no longer available for a physical inventory to be made. Mr. Holdner suggested to Mr. Loose that the costs of the items on the list should be determined by using either dealer or wholesale price lists in effect during the times he had acquired the items (1975-1979). That was not done. The initial pricing of these items was done by the corporation's shopman, William Rowles, who prices each item separately using only a 1979 price book to arrive at a total figure of $16,416.95. When Mr. Holdner received the list of items containing Mr. Rowles' price figures, he went through the list and made independent checks to determine whether the prices ascertained by Mr. Rowles were in excess of the figures shown on the 1979 price lists. Mr. Holdner wanted to take into account obsolescence and inflation. He thus consulted a wholesale plumbing and electrical distributor to try *268 to determine the differences between 1979 prices and 1975 prices. Mr. Holdner's objective was to try to arrive at the lower of cost or the fair market value of these items at the time of the transfer to the corporation. Mr. Holdner had no infomation or documentation as to the actual cost of the items to Mr. Loose. Mr. Holdner had no independent knowledge as to what items had in fact been transferred to the corporation. After discarding some nonelectrical items on the list and making certain price adjustments, Mr. Holdner arrived at a figure in the amount of $11,623.85, approximately a 30 percent reduction from Mr. Rowles' $16,416.95, which he used in setting up the corporation's accounting records for its first year of operation. In closing the books of the corporation for the fiscal year ended June 30, 1980, Mr. Holdner treated this transfer as a sale by Mr. Loose to his corporation. On the corporation's accounting records, Mr. Holdner credited $11,623.85 to Mr. Loose as reflected in the "Notes Payable-Officers" account and charged $11,623.85 to costs of goods. The corporation never issued a note or any other evidence of indebtedness to Mr. Loose evidencing its purported indebtedness *269 to him from the sale of these items. On the corporate income tax return for the fiscal year ended June 30, 1980, Mr. Holdner included this $11,623.85 in the corporation's cost of goods sold. The "Notes Payable-Officers" account is a liability account that purportedly reflects the corporation's indebtedness to its officers. When Mr. Loose acquired the corporation on or about July 1, 1979, the beginning balance of the "Notes Payable-Officers" account was $7,195.37. The record is wholly silent as to the nature of that purported indebtedness, but it related to Mr. Weber rather than to Mr. Loose. Shortly after July 1, 1979, the amount of $4,200 was credited to this account, bringing the total liability in this account to $11,395.37, all relating to Mr. Weber. This did not include the $11,623.85 allegedly due from the sale. For the fiscal year ended June 30, 1980, this account had an ending balance in the amount of $12,033.09, which included the liability for the sale of the materials. The corporate accounting records set up by Mr. Holdner included many personal items of Mr. and Mrs. Loose, apparently loans or advances to the corporation and draws for personal expenses from the *270 corporation. [6] We cannot find, as Mr. Holdner seems to argue, that none of these payments were payments for the electrical supplies and materials transferred to the corporation. During its fiscal year 1980, the corporation paid Mr. Loose at least $6,913.41 for the electrical supplies and materials he had transferred to it. Thus, Mr. Loose was paid $2,845 during calendar year 1979 and $4,068.41 during calendar year 1980. *271 During its fiscal year ended June 30, 1980, the corporation issued two checks that are in dispute in this case: a check payable to cash dated September 14, 1979, in the amount of $750, and a check payable to Mr. Weber, dated December 13, 1979, in the amount of $456. Neither original check is in evidence, but the non-negotiable carbon copy of the "SBC" type check is in the record. [7] Any notations as to purpose are found in the check register and not on the check itself. The notation in the register for the $750 check indicated it was issued as payment for adjusting the lights on job #380. That check was signed by Mr. Loose. There is no evidence as to who endorsed the check or who actually received the payment. [8] Mr. Holdner classified this payment on the corporation's tax return as a "cost of sales" or "cost of the job." *272 The $456 check to James E. Weber bears two conflicting notations in the check register -- that it was issued as a draw by Mr. Loose for materials supplied to the corporation or as payment of two installments to Jim Weber for the purchase of the corporate stock. This check was signed by Mark Loose and was not explained at trial. [9] Mr. Holdner deducted this payment on the corporation's tax return as an ordinary and necessary business expense. *273 In acquiring the stock of the corporation, Mr. Loose also acquired the corporate automobile, a 1979 Ford Mustang, that Mr. Weber had used in the business. The automobile was parked each night at Mr. Weber's residence until September of 1979, at which time Mr. Loose began driving the automobile back and forth to the office each day for the remainder of 1979 and all of 1980. [10]
From July of 1979 to about August of 1980, the corporation's office was located at Mr. Weber's personal residence. *274 In late August of 1980, the corporation established a new place of business in Scappoose, Oregon, at which time all of its business equipment and supplies were moved from Mr. Weber's residence to the new office in Scappoose. Mr. Loose commuted between his personal residence and the corporate office at Mr. Weber's home or the Scappoose office. Mr. Loose's residence was located 26 miles from Mr. Weber's residence and 22 miles from the office in Scappoose. Mr. Loose generally stopped at the post office on his way to work, which was approximately two blocks from the office in Scappoose. The corporation paid virtually all of the expenses incurred in connection with the operation of the Ford Mustang. However, Mr. Loose occasionally purchased gas for which he was not reimbursed. By statutory notice of deficiency dated May 28, 1982, respondent reduced the corporation's cost of goods sold deduction of $87,965 by $12,830. The $12,830 represented the $11,623.85 for items purchased from Mr. Loose and the two checks for $750 and $456.By statutory notice dated May 28, 1982, respondent determined that Mr. Loose sold materials valued at $11,623.85 to the corporation during the taxable year *275 1979 but the sale was not reported on his joint return for such year. Since no basis for the materials had been established, respondent increased Mr. Loose's taxable income for 1979 by $11,623.85. In addition, respondent also determined that during the taxable years 1979 and 1980 the corporation permitted Mr. Loose to use a corporate automobile and that such personal use constituted constructive dividend income to him in those years under sections 61, 301, and 316. Accordingly, respondent increased his taxable income for the taxable years 1979 and 1980 in the amounts of $721.50 and $2,600, respectively. [11] Respondent's adjustment was based on a daily commute of 52 miles from his home to office using 15 weeks for 1979 and a 50-week year for 1980. The income for the personal usage was computed by using the standard mileage rate for the years in question ($ .185/mile for 1979 and $ .20/mile for 1980). *276 OPINION This case suffers an absence of theme or theory. Neither party considered what the Court regards as the most logical explanation of the events -- a nontaxable contribution to capital by Mr. Loose to his wholly owned corporation, Weber Electric, Inc. While the Court rather doubts that a "sale" of electrical supplies and materials occurred or was intended, the parties have given the Court little choice except to decide the case on that basis. [12]
*277 The corporate petitioner, having purchased the electrical supplies and materials from Mr. Loose, is entitled to treat the purchase price as part of its cost of goods sold. The question is what is that purchase price? The Court does not accept the so-called "stated consideration" (the $11,623.85) as the purchase price. See n.4, supra. That figure, developed by Mr. Holdner, the CPA, long after the event and long after the items had been used up and were no longer available for a physical inventory, is essentially meaningless. The CPA tried to develop a figure to represent the lower of cost or fair market value of the items at the time of their transfer to the corporation. The CPA did not have any knowledge or information as to what, if anything, Mr. Loose had actually paid for the material, nor did the CPA have any knowledge or information as to what items were actually transferred to the corporation. However, in setting up the corporation's accounting records and reconstructing its income for its first year of operation and thereafter, Mr. Holdner treated all of the payments between Mr. Loose and his corporation as personal transactions (other advances to or draws from the *278 corporation) other than payment for the electrical supplies and materials. While we cannot reconcile all of the ambiguities and uncertainties in these accounting records, we are satisfied that during its fiscal year ended June 30, 1980, the corporation paid Mr. Loose $6,913.41 for the electrical supplies and materials. As an accrual basis taxpayer, the corporation could deduct the full purchase price in its fiscal 1980 even though not yet paid, but the Court cannot find, on this record, that the purchase price was more than the amount actually paid, the $6,913.41. Accordingly, the corporate petitioner is entitled to treat that amount as part of its cost of goods sold. As to Mr. Loose, there is no evidence in the record as to what, if anything, he paid for the electrical supplies and materials he transferred to his corporation. He has not established any basis in the items, nor is there anything in the record to permit the Court to make any approximation under the Cohan rule. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). Any attempt to apply the Cohan rule here would amount to sheer "unguided largesse" on the part of the Court. Williams v. United States,245 F.2d 559, 560 (5th Cir. 1957). *279 Accordingly, Mr. Loose must include in income the $2,845 payment he received from the corporation in calendar year 1979 and the $4,068.41 he received in calendar year 1980. However, respondent determined a deficiency in the individual petitioners' 1980 Federal income tax of only $600, and respondent has not sought an increased deficiency for that year. Accordingly, any deficiency in the individual petitioners' tax for the year 1980 cannot exceed the $600 figure. Section 6214(a). In regard to the minor items of $750 and $456, the corporate petitioner has the burden to establish that it is entitled to these amounts as either deductible business expense or part of the cost of goods sold. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). As shown in the findings of fact, the corporation has not sustained its burden of proof and we sustain respondent's disallowance of these two amounts. With respect to the final issue, respondent determined that Mr. Loose received constructive dividend income as a result of his personal use of the corporation's automobile. Mr. *280 Loose drove the corporation's Mustang back and forth each day from his home to the office beginning in September of 1979, and continuing through December of 1980. The personal usage determined in respondent's adjustments includes only the mileage driven by Mr. Loose in commuting back and forth to the office in the Mustang. No other personal usage was considered. Section 61(a) defines gross income as all income from whatever source derived, including dividends. Sec. 61(a)(7). Under sections 301(a), 301(c)(1), and 316, a distribution of property made by a corporation to a stockholder generally is includable in the stockholder's gross income as a dividend to the extent of the corporation's earnings and profits. [13] A distribution under section 301 may be found even though the corporation has not formally declared a dividend. Crosby v. United States,496 F.2d 1384, 1388 (5th Cir. 1974). It is well settled that *281 where corporate property is used by a stockholder or member of his family for personal purposes, not proximately related to the corporate business, the fair rental value of such property is includable in the stockholder's income as a constructive dividend to the extent of the corporation's earnings and profits. Falsetti v. Commissioner,85 T.C. 332, 356 (1985). The Court of Appeals for the Ninth Circuit, to which any appeal in this case would lie, has held that the fact that corporate payments are not deductible does not automatically result in constructive dividends to a stockholder. Palo Alto Town & Country Village, Inc. v. Commissioner,565 F.2d 1388, 1391 (9th Cir. 1977); Falsetti v. Commissioner,supra,85 T.C. at 356-357. *282 The test for constructive dividends is twofold: Not only must be expenses be nondeductible to the corporation, but they must also represent some economic gain or benefit to the stockholder. Meridian Wood Products Co. v. United States,725 F.2d 1183, 1191 (9th Cir. 1984); Palo Alto Town & Country Village, Inc. v. Commissioner,supra,565 F.2d at 1391. See also Ireland v. United States,621 F.2d 731, 735 (5th Cir. 1980); Loftin and Woodard, Inc. v. United States,577 F.2d 1206, 1215 (5th Cir. 1978); Ashby v. Commissioner,50 T.C. 409, 417-418 (1968). Thus, where a corporation makes a distribution to a stockholder which serves no legitimate corporate purpose and which results in an economic benefit to him, such benefit constitutes a constructive dividend to the extent of earnings and profits. Palo Alto Town & Country Village, Inc. v. Commissioner,supra,565 F.2d at 1391; Falsetti v. Commissioner,supra,85 T.C. at 356. Section 162(a) allows a deduction for *283 all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, which includes expenses of operating automobiles used in the trade or business. Sec. 1.162-1(a), Income Tax Regs. However, expenses incurred by a taxpayer in traveling between his residence and his regular place of employment are personal commuting expenses and therefore nondeductible. Secs. 1.162-2(e), 1.262-1(b)(5), Income Tax Regs.; Commissioner v. Flowers,326 U.S. 465 (1946); Hynes v. Commissioner,74 T.C. 1266, 1295-1296 (1980). The two-prong dividend test has been satisfied in the instant case. First, it is well established that where corporate property is used by a stockholder or a member of his family for purposes not proximately related to the corporate business, the corporation is not entitled to deductions to the extent that they relate to such personal use. Falsetti v. Commissioner,85 T.C. at 356. Second, driving the corporation's Mustang to and from work clearly represents an economic benefit bestowed on Mr. Loose by the corporation. Respondent included in Mr. Loose's *284 income constructive dividends in the amounts of $721.50 and $2,600 for the taxable years 1979 and 1980, respectively. Respondent's determination is presumptively correct and petitioners bear the burden of proving error therein. Welch v. Helvering,supra;Rule 142(a). Petitioners have not challenged the method used by respondent in computing the income generated by the personal usage of the corporation's automobile and have not suggested any alternative value for the personal usage. We, therefore, sustain respondent's determination. [14]
To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. Respondent determined that petitioner Weber Electric, Inc., was liable for an addition under section 6651(a) for the late filing of its corporate return for its fiscal year ended June 30, 1980. This issue was not raised or discussed in the petition, at trial, or in petitioner's briefs, and thus is deemed to be conceded. Rule 34(b)(4). In any event, the facts show that the delinquency addition was properly imposed. Respondent's opening brief refers to a negligence addition under section 6653(a), but that would appear to be a typographical error.↩
2. The corporation applied for an automatic three-month extension of time to file its return, extending the due date from September 15, 1980 to December 15, 1980. An unsigned Form 1120 was received at the Service Center on January 2, 1981. Mr. Loose signed a declaration under penalties of perjury adopting the return on January 29, 1981, and that declaration was received at the Service Center on February 15, 1981.↩
3. The record does not disclose the total purchase price for the stock, bur Mr. Weber was to receive monthly payments in the amount of $228.43 from the sale.↩
4. During trial, we had serious reservations that we expressed on the record as to whether these items ever existed. We found it peculiar that Mr. Loose would acquire this amount of material and keep it stored in his garage with the idea that someday he might go into an electrical contracting business. We did not find Mr. Loose's testimony wholly credible, and Mr. William Holdner, the corporation's certified public accountant, had little or no personal knowledge of the matters about which he testified so extensively. However, since the parties have stipulated that Mr. Loose made a "transfer" of inventory items to the corporation, and since there was no request to be relieved of the stipulation, we have found as facts that the items existed and were transferred to the corporation. The parties have also stipulated in ambiguous language that "[t]he stated consideration for this transfer was $11,623.85." The Court is not told by whom, when, how, or for what purpose it was "stated." As will be discussed below, this figure was one developed by Mr. Holdner a year and a half later when he was setting up accounting records and reconstructing the corporation's income for its first year of operation. There is no written documentation of the transfer in mid-1979, and the Court rejects any suggestion that there was any agreement between the corporation and Mr. Loose as to the amount of consideration, if any, to be paid for the transfer of the electrical supplies and tools.↩
5. Mr. Loose suggested that he made an original list of the items transferred as he loaded the items on his truck to haul them to the corporation's office, which was then located at Mr. Weber's home. Mr. Loose further suggested he gave the list to his shopman, William Rowles, who added a few items that Mr. Loose had overlooked. At some point, Mr. Rowles allegedly wrote out another list of these items. The list, presumably written by Mr. Rowles, was stipulated into evidence. Mr. Rowles, recovering from a lumg operation at the time of trial, was not available to testify. The original list purportedly prepared by Mr. Loose was not produced at trial. In view of the rather vague stipulation and the rather improbable scenario suggested by Mr. Loose's testimony, the Court has doubts as to when, by whom, and for what purpose the list in evidence was prepared.↩
6. In closing the corporation's books for the fiscal year ended June 30, 1980, Mr. Holdner set up a liability account as notes payable "R. M. Loose," which was separate and distinct from the "Notes Payable-Officers" account. As of June 30, 1980, the notes payable "R. M. Loose" account reflected a balance of $5,458.34 and as of December 31, 1980, the balance of this account was $8,458.34. At the close of the fiscal year ended June 30, 1981, the balance of this account was $8,548.80. Mr. Holdner indicated that the company's bank statements showed that a loan was made by R. M. Loose to the corporation during that fiscal year and this separate liability account was inadvertently set up because at the time he did not realize that R. M. Loose was the spouse of Robert Loose. Mr. Holdner stated that the transactions in these accounts represent all the transactions that involved Mr. and Mrs. Loose personally, and consequently, the "Notes Payable-Officers" account and the notes payable "R. M. Loose" account should be treated as one consolidated notes payable account. The computerized general ledger of the corporation for the fiscal year ended June 30, 1981, contains separate listings for the "Notes Payable-Officers" account (1520) and the notes payable "R. M. Loose" account (1510), which seem to undermine Mr. Holdner's testimony that the notes payable "R. M. Loose" account was inadvertently set up. Mr. Holdner offered no explanation why these accounts were not consolidated at the time his firm input the corporation's books and records into the computer. Moreover, the check dated January 24, 1980, in the amount of $5,000, representing partial repayment of a $10,000 loan to the corporation, indicates that Mr. Loose considered the liabilities in both of these accounts to be separate and distinct, since this check was specifically made payable to Rose Marie Loose. We cannot resolve all the ambiguities in these accounting records.↩
7. The copies of the checks in evidence are not photocopies of the originals. According to Mr. Holdner, Mr. Loose used an "SBC" type check that produces an original and two copies of every check that is written. The photocopies of the checks in evidence contain the word "Non-Negotiable" on their face, which indicates these were not copies of the original checks, but copies of the copies. ↩
8. Mr. Loose testified that this check represented a cash payment to Pat Harbison for work he had performed for the corporation. According to Mr. Loose, Mr. Weber had made the arrangements with Mr. Harbison to perform the work at night, and Mr. Harbison allegedly requested to be paid in cash to avoid any possible conflict with his union for moonlighting. Mr. Harbison, however, did not testify at trial and the record contains no documentary evidence that Mr. Harbison received this payment. Moreover, the record indicates that Mr. Harbison performed other work for the corporation for which he received payment by check. We also find it significant that the corporation has no record of ever issuing or filing a Form 1099 for the alleged payment to Pat Harbison, as required by section 6041(a).↩
9. Two conflicting notations appear on the check register for this check indicating that the check was issued either as a draw by Robert Loose for materials supplied to the corporation or in payment of two installments to Jim Weber for the purchase of the stock. However, at some point in time this latter notation was crossed out. At trial, the only testimony concerning the purpose of this $456 payment came from Mr. Holdner who had no personal knowledge of the matter. Mr. Holdner testified that his investigation revealed that the check for $456 was issued to Mr. Weber in repayment for a bond that he had purchased on connection with an earlier job; this testimony, however, does not conform with either of the notations on the check register and is entirely uncorroborated. Mark Loose, who signed the check, testified at trial but was not asked about this payment. His father, Mr. Loose, could not recall the purpose for issuing this check to Mr. Weber. Mr. Weber did not testify.↩
10. Nina Moore, respondent's revenue agent, testified that Mr. Loose admitted to her during audit that he drove the corporateowned Mustang back and forth to work on a daily basis, a distance of approximately 52 miles round-trip. At trial, Mr. Loose would only admit that he occasionally commuted back and forth in the Mustang. He did not recall admitting to Nina Moore that he commuted in the Mustang on a daily basis. Although Nina Moore did not recall verbatim every statement made by Mr. Loose during audit, the contemporaneous notes that she compiled of her conversation with Mr. Loose concerning the Ford Mustang substantiate her testimony, which we found to be both credible and reliable.↩
11. Respondent also determined that since Mr. Loose was a shareholder of the corporation in 1980, the value received from the personal use of the corporate automobile constituted a dividend to him. Respondent accordingly allowed him the $100 dividend exclusion for the taxable year 1980. It is unclear why respondent did not allow Mr. Loose the $100 dividend exclusion for 1979, since the record indicates that Mr. Loose was also a shareholder of the corporation during the 1979 taxable year.↩
12. Other than having a vague disquietude that something was not quite right about the transaction, respondent seems to have audited, tried, and briefed these consolidated cases without any core theme or theory. The parties' stipulations of fact are vague and ambiguous as to the key event -- Mr. Loose's "transfer" of electrical supplies and materials to the corporation after he purchased the stock of the corporation, the "stated consideration" for that transfer, the purported "list" of items transferred, and the costing of the items on that list. See nn.4, 5, supra. Each litigant chose to put on as his principal witness a person singularly lacking in any personal knowledge of the underlying facts: petitioners' CPA and respondent's revenue agent. The stipulation as to a "transfer" of the items need not bind the Court as to any legal conclusion that the substance of the transaction was a "sale" between Mr. Loose and his corporation. The record is wholly devoid of competent, probative documentary or testimonial evidence as to what really happened in July or August of 1979. The whole theory of a "sale" seems to have originated as an afterthought developed by the CPA long after June 30, 1980, when he began setting up the corporation's accounting records and reconstructing its income for its first year of operation in preparation for filing its corporate tax return for that year. In his opening brief respondent for the first time raised a section 267 argument, which he promptly conceded in his reply brief. In his reply brief respondent for the first time raised a "sham" argument, without delineating what the purported sham was supposed to be. If his argument relates to the Court's concerns expressed on the record at trial, it is much too late to raise that matter now. See n.4, supra. On the contrary, in his reply brief respondent asks for additional findings of fact but still on the theory that the corporation "purchased" the electrical supplies and materials. Thus, while the Court might well be justified in disregarding the parties' stipulation to the extent it may be read as stipulating to a legal conclusion (compare Hymel v. Commissioner,787 F.2d 586 (5th Cir. 1986), reversing T.C. Memo. 1985-198↩ on the ground that the Court had improperly disregarded a stipulated fact), respondent has not asked us to treat the transaction as anything other than a sale. Respondent himself seems to frame the issue in terms of a sale between Mr. Loose and his corporation. So shall we.
13. Petitioners presented no evidence in regard to the corporation's earnings and profits. Therefore, petitioners have failed to meet their burden of proving that any distributions Mr. Loose received from the corporation were not out of its earnings and profits and not taxable as ordinary income under sections 301(c)(1), 316(a), and 61(a)(7)↩.
14. On brief, respondent concedes that for the months of September through December of 1980, the corporation's office was located 22 miles from Mr. Loose's residence rather than 26 miles as used by respondent in his calculation. Therefore, the constructive dividend of $2,600 should be reduced accordingly in the parties' Rule 155 computation by using 44 miles X $ .20/mile for the period of September through December of 1980.↩