NUMBER 13-97-790-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI

 ____________________________________________________________________ 



RUBEN RIVAS AND HAPPY YEARS, INC., Appellants, 



v.

 

CASIMIRO (CASEY) CANTU, Appellee. 

____________________________________________________________________ 



On appeal from the 139th District Court of Hidalgo County, Texas. 

____________________________________________________________________ 



O P I N I O N 



Before Chief Justice Seerden and Justices Hinojosa and Yañez 

Opinion by Justice Hinojosa

 

 Casimiro Cantu sued Happy Years, Inc. (an adult day-care business), Ruben Rivas, Josie Alvear, and Juan Guerra
(shareholders of the corporation), and First State Bank of Mission (Rivas's employer), alleging causes of action, inter alia,
for breach of contract and fraud. Guerra was non-suited after he filed for bankruptcy, First State Bank was dismissed from
the suit before trial, and Alvear was dismissed from the suit before the charge was submitted to the jury. Only the causes of
action against Happy Years and Rivas were submitted to the jury. The jury found that: (a) Happy Years had breached its
contract with Cantu, (b) Cantu was entitled to Happy Years stock, and (c) Cantu had suffered damages for constructive
dividends paid by the corporation to other shareholders. The jury also found that Rivas had committed fraud against Cantu
and found actual and exemplary damages resulting from the fraud. 

 By six issues, Happy Years contends: (a) the evidence is legally and factually insufficient to support the jury's answers to
Question Nos. 1 and 5; (b) the trial court erred in granting judgment in favor of Cantu because there is no evidence or
insufficient evidence "to support the trial court's implied finding of Breach of Contract" and because there are no pleadings
to support the judgment; and (c) appellee's claims are barred by the statute of frauds. By eleven issues, Rivas contends the
evidence is legally and factually insufficient: (a) to support the jury's findings that Rivas committed fraud against Cantu; (b)
to support the jury's award of actual damages for fraud; and (c) to support the award of exemplary damages and
prejudgment interest. He further complains that Cantu's claims are barred by the statute of frauds. We affirm in part and
reverse and remand in part. 

A. Jury Findings

 The jury answered the following questions: 

Question No. 1: Did Casimiro Cantu and Happy Years, Inc., agree: To employee [sic] Casimiro Cantu as executive
director for a salary of $2,500.00 per month beginning in March 1990? 

 

 Answer: YES 



Question No. 2: Do you find that Casimiro Cantu complied with his end of the agreement in Question No. 1? 

 

 Answer: YES 



Question No. 3: Was Happy Years, Inc.'s failure to comply with the agreement in Question No. 1 excused? 

 

 Answer: NO 



Question No. 4: What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Casimiro Cantu
for his damages, if any, that resulted from such failure to comply with the agreement in Question No. 1? 

 Do not add any amount for interest on past damages, if any. 

 

 Answer: $25,000 



Question No. 5: Did Casimiro Cantu and Happy Years, Inc., agree: To award Casimiro Cantu 25% of the Stock of Happy
Years, Inc,. if he fulfilled his obligations under their agreement? 

 

 Answer: YES 



Question No. 6: Do you find that Casimiro Cantu complied with his end of the agreement in Question No. 5? 



 Answer: YES 



Question No. 7: Was Happy Years, Inc.'s, failure to comply with the agreement in Question No. 5 excused? 

 

 Answer: NO 



Question No. 8: What percentage (%) of ownership of Happy Years, Inc., if any, should be transferred to Casimiro Cantu? 



 Answer: Fifty -- 50%(1)



Question No. 9: What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Casimiro Cantu
for his damages, if any, that resulted from such failure to comply with the agreement in Question No. 5? Answer as to the
Defendant listed below: 

 Consider the following elements of damages, if any, and no other. Lost economic benefits including profits that were a
natural, probable and foreseeable consequence of Defendant HAPPY YEARS, INC. [sic] failure to comply. 

 Do not add any amount for interest on past damages, if any. 

 

 Answer: Happy Years, Inc. -- $ 86,569.00 



Question No. 10: 

 Did Ruben Rivas commit fraud against Plaintiff Casimiro (Casey) Cantu? Fraud occurs when -- 

 a. A party makes a material misrepresentation, 

 b. The misrepresentation is made with knowledge of the its [sic] falsity or made recklessly without any knowledge of the
truth and a positive assertion, 

 c. The misrepresentation is made with the intention that it should be acted on by the other party, and 

 d. The other party acts in reliance on the misrepresentation and thereby suffers injury. 



 Answer: YES. 



Question No. 11: 

 What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Casimiro Cantu for his damages,
if any, that resulted from such fraud on the part of Ruben Rivas. Consider the following elements of damages, if any, and
none other. 

 Lost economic benefits including profits that were a natural, probable, and foreseeable consequence of Defendant Ruben
Rivas's failure to comply. 



 Answer: $86,569.00 



 The mental anguish sustained by Plaintiff: 



 Answer: $0.00 



Question 12: 

 Did the Defendant Ruben Rivas act with actual malice? "Actual malice" means ill will, spite, evil motive, or purpose to
injure another. 



 Answer: NO 



The verdict was unanimous. 



 Cantu elected his fraud remedy because it supported the finding of exemplary damages. After various post-judgment
motions, the trial court entered an Amended Final Judgment ordering: 

(a) Happy Years to immediately issue stock certificates transferring a twenty-five percent ownership interest to Cantu; 



(b) that Cantu recover from Happy Years actual damages in the amount of $21,600.00,(2) and prejudgment interest in the
amount of $8,856.00; and 



(c) that Cantu recover from Rivas actual damages of $86,569.00, prejudgment interest of $63,852.07, and exemplary
damages of $100,000.00. 

 

B. Testimony at Trial

 The record reflects that Cantu, Rivas, and Alvear testified at trial, as did Cantu's expert witness on damages. The
following are summaries of their testimony. 

1. Testimony of Casimiro Cantu

 Casimiro Cantu testified that he had been a social worker with the Texas Department of Human Services for many years.
In 1988, Cantu realized that due to changes in the federal Medicaid program, there was a business opportunity in providing
day-care services to certain elderly people with Medicaid coverage. In 1989, he compiled a feasibility study concerning the
possible profitability of such an adult day-care center. At that time, there were approximately three such centers in the area.
Cantu learned about the lengthy and complicated procedure involved in obtaining a state license to operate an adult
day-care center, which includes a contract with the state to provide services to eligible Medicaid recipients.(3)

 In 1989, Cantu entered into an agreement with Frank Flores to open an adult day-care center called "My Golden Years."
Flores was to receive a sixty percent share of the business for providing the start-up money. Cantu was to receive a forty
percent share of the business for providing the expertise to start the business and a salary of $2,000 per month to run it. He
was paid this salary during the time he was setting up the business and obtaining the license. After Cantu obtained a state
license for the business, the Flores/Cantu partnership ended after a dispute over ownership percentages and hiring
decisions. 

 Cantu consulted local Small Business Administration (SBA) officials, who told him that before the SBA could consider
him for a loan, he had to prepare a written proposal and try to obtain a loan from a bank. Cantu talked with Alvear, a
licensed vocational nurse who worked at My Golden Years, about his plan. She then referred him to her "very close friend"
Rivas, a loan officer with First State Bank. In February 1990, Cantu went to First State Bank seeking a start-up loan. 

 Rivas did not permit Cantu to fill out a loan application. He told Cantu that the Bank would not lend him the money
because the idea was too risky and Cantu had no business experience and no collateral. Rivas instead proposed that he
would finance Cantu's idea in exchange for fifty percent of the day-care business. Rivas stated that he had access to
$250,000 and that they could open five or six centers. He pointed out that it would be better for Cantu to own fifty percent
of six centers, rather than one hundred percent of one center. Cantu relied on Rivas's representations, and after several
meetings, agreed to incorporate the business. Rivas and Cantu agreed that Rivas would receive a fifty percent ownership
interest in the corporation in return for the financing, and Cantu would receive a fifty percent ownership interest in the
corporation for his knowledge and expertise in obtaining the necessary license and starting up the business. Rivas and
Cantu also agreed that Cantu would receive a salary of $2,500 per month (the same as his salary at DHS) to act as the
executive director of the business.(4) Cantu retained a local "legal assistant," Luis Ramirez, to handle the incorporation, and
immediately began working to obtain the license. 

 Rivas later told Cantu he wanted Guerra, Rivas's business partner (whom Cantu had never met) included in the venture
because of Guerra's business experience. Cantu objected, and Rivas "said that's okay." 

 Later, Rivas demanded that Alvear also be included as an owner because she could provide state-required nursing services
to the business and contacts to referring physicians. As an employee, she could also be paid for her nursing services. Rivas
"made it seem like . . take it or leave it." 

 When they met to sign the incorporation documents in April of 1990, Rivas told Cantu he had decided that Guerra would
be a corporate owner: 

to protect his interest . . you have to take it, accept it, or bye-bye. So I didn't really have much of a choice. . . . He said that
the people with the money need to have control so he and Mr. Guerra needed to own minimum fifty percent so they could
set the rules and they could say what's going on. . . . That's when Mr. Rivas introduced Mr. Guerra and gave me the
ultimatum. So at that point they brought me down to 25 percent. It was going to be me, Mr. Rivas, Mr. Guerra and Ms.
Alvear, 25 percent each. 



Cantu reluctantly agreed because he did not want to abandon the plan in which he had already invested so much time. 

 The incorporation was completed on April 9, 1990. The articles of incorporation for Happy Years, Inc. list Cantu, Rivas,
Guerra and Alvear as incorporators and board members, and authorize the issuance of up to one million shares of stock
without par value. The articles specify that the corporation "will not commence business until it has received for the
issuance of the shares consideration of the value of One Thousand Dollars ($1,000.00), consisting of money, labor done, or
property actually received." At the first board meeting, Cantu was elected president, Alvear was elected secretary, Rivas
became vice-president, and Guerra became the treasurer. Guerra never invested any time or effort into the business and
filed for bankruptcy soon after the incorporation. 

 Beginning in late March, 1990, Cantu oversaw the remodeling of an old leased warehouse to insure compliance with state
specifications for adult day-care centers. He obtained the license for the business, and Happy Years opened its doors on
July 30, 1990. Cantu received no compensation for the work he performed from March, 1990 through August, 1990. He
kept working without pay because "they had promised me that as soon as we opened I would be getting paid and I would be
getting some back pay for all this." In September, 1990, he began receiving wages of $200 per week. When he brought up
the matter of his promised $2,500 monthly salary at board meetings, he was outvoted each time, three to one. 

 Cantu's working conditions at Happy Years began to deteriorate shortly after the business opened. He had no input into
staff hiring, which was done by Alvear, and his authority as executive director was usurped by Alvear, who countermanded
his instructions to the staff.(5) He was regularly humiliated in front of the staff and others. For example, Alvear had Cantu's
desk removed from his office and placed in hers without telling Cantu, causing him humiliation and embarrassment in front
of a business contact. Feeling he was being forced out by not being paid, and by his humiliating treatment, Cantu stopped
working as a Happy Years employee in mid-December, 1990. He felt that he had already fulfilled his end of the bargain, as
far as getting the business started, and had earned his twenty-five percent of the corporation: 

my intent was that I had already done my end to deserve my percentage . . . . I had done the incorporation process. They
used my expertise. They used my knowledge. I had already done what I had promised them that I would do to earn my
percentage now as [sic] a matter of working there just like Mrs. Alvear and everybody that was employed there. 



He made several attempts to convene a board meeting to discuss the status of his ownership in the business, and demanded
the issuance of his stock certificates, but Alvear and Rivas refused to do so. The locks at the center were changed the day
after Cantu quit. Cantu later served as a consultant in helping start up and obtain licensing for another day-care business,
and eventually opened his own, successful adult day-care centers. 

2. Testimony of Ruben Rivas

 Ruben Rivas testified that he was a consumer loan officer with First State Bank. He also owned five Movie Land Video
stores, two finance companies, and other real estate holdings. Guerra was his partner in Movie Land Video and some of the
real estate holdings. Movie Land Video was incorporated. His real estate holdings with Guerra were also incorporated. 

 Rivas's first meeting with Cantu did not occur at the Bank. It occurred at the Doubletree Hotel where Alvear had set up a
dinner meeting. Cantu claimed he knew all about the adult day-care business and had just formed such a business. Cantu
wanted to set up his own business and asked if Rivas was interested in financing it. Cantu left a copy of his proposal with
Rivas. They had several other meetings. At the last meeting, the stock percentages were finalized at twenty-five percent
each for Rivas, Guerra, Alvear and Cantu. Cantu was not happy with the ownership percentages. Rivas denied telling
Cantu that he had $250,000 with which to open a chain of day-care centers. Cantu hired Ramirez, who had helped him
incorporate My Golden Years, to do the incorporation. Ramirez never prepared or delivered any stock certificates. 

 In 1990, Rivas had no experience with or knowledge of the adult day-care industry or of how to start up such a business.
He borrowed $60,000 from a bank that was affiliated with First State Bank. The loan was made out to Happy Years, but
Rivas personally guaranteed it and put up some stock he owned as collateral. The loan payments were initially made out of
the loan proceeds. Cantu was not receiving any pay during that time. The loan was paid off within two years. Rivas never
made any loan payments with his own money, but put some of his own money into Happy Years to keep the new company
going until it was profitable. 

 When they entered into their agreement, Rivas, Cantu, Alvear, and Guerra were each to receive twenty-five percent of the
business. Guerra was to receive his twenty-five percent because: 

I did not have the time. I trust Mr. Guerra. We have had numerous business dealings. I respect his judgment. He's -- he's
good at it. The only reason I went in is if he went in to take care of my interest and basically that's because I trusted him. I
didn't know Mr. Cantu. I wasn't just going to drop $50,000 on his lap and let him do, I mean, I'm sorry. It doesn't work like
that. I put Mr. Guerra [sic] to take care of my money and for his services, he was going to get 25 percent of it. 



Rivas did not know in March of 1990 that Guerra was on the verge of filing for bankruptcy. 

 Alvear became a partner because she was the one who "brought the idea to me," and because Rivas knew and trusted
Alvear. She also was to be hired as an employee because the business needed nursing services. Rivas admitted he could
have just hired her as an employee, but said he brought her in as a corporate owner "because I needed her." Happy Years
has since built a second day-care center, and Rivas had an ownership interest in another adult day-care business called Dias
Felices. 

 Rivas admitted that Cantu had a twenty-five percent ownership in Happy Years when it started. Rivas never received a
stock certificate for his shares of Happy Years stock. Rivas has received directors' fees from Happy Years. Currently,
Rivas has no ownership interest in Happy Years. After Guerra filed for bankruptcy, Rivas and Guerra traded Happy Years
and Movie Land Video stock. Rivas got the Happy Years stock; Guerra got the Movie Land Video stock. Rivas later
transferred his interest in Happy Years to Alvear. 

 Cantu lost his ownership percentage "when he walked out on me . . . he drops the ball in the middle of the game and he
walks off." Cantu did not earn his twenty-five percent because "he led me to believe he knew the day-care business, which
he didn't." Cantu had two roles. One was to get the business licensed and started; the other was to be the director of the
business. 

 When Rivas's own attorney asked him: 

And what had you and the other members of the board of directors, what had you all agreed was going to happen in regards
to Mr. Cantu's salary? 



Rivas responded: 



We had all agreed that once the company, or the entity was operating and producing enough money, we would be glad to
give him these $2,000. But not until then. I mean there was a lot of money involved and it could not afford it. 



Cantu was required to stay with Happy Years until it turned a profit to earn his twenty-five percent. He did not do that.
When Cantu left, it was like a "bomb blew up in my face." Happy Years had to find a qualified director immediately, or the
state would have canceled Happy Years' contract. 

3. Testimony of Josie Alvear

 Josie Alvear testified that she now owns 100 percent of Happy Years' stock. She traded her interest in another adult
day-care business, Dias Felices, to Rivas in 1997 in exchange for his two-thirds interest in Happy Years. They started Dias
Felices in 1993 when Happy Years reported a loss of $16,000. Rivas and Guerra were also stockholders in Dias Felices,
but Alvear "was the main person." They each held a one-third interest. 

 Alvear said Cantu forfeited his twenty-five percent of Happy Years: 

the day he walked out and he did not do the job that he was given 25 percent of the stock to do. [H]e walked out and didn't
keep his end of the bargain. He was supposed to help get this company off the ground. He walked off three months into
the business. 



Alvear did not know what Cantu was paid when he worked at Happy Years. 

 The current director of Happy Years, who is also the registered nurse (RN) required by state adult day-care regulations, is
paid twenty dollars per hour. The licensed vocational nurse (LVN) who currently works at Happy Years was paid $26,700
in 1995. Alvear was paid $45,000 for her work as an LVN and manager of Happy Years. In 1996, Alvear was paid
$67,529, but the other LVN was paid $27,500. Alvear sets the salaries, including her own. Alvear's position of manager is
not required by the state. The state only requires a director. Under current state regulations, a director must have a college
degree. 

 Happy Years has never had any money to pay dividends to its shareholders. According to Happy Years' corporate income
tax returns, in 1994, when Alvear made $39,000, Happy Years grossed $568,619 and reported a profit of $51,854; in 1995,
when Alvear made $45,000, Happy Years grossed $568,621 and reported a loss of $16,244. In 1996, when Alvear paid
herself $67,000, the company grossed $568,610 and reported a loss of $16,000. According to Alvear, Happy Years is not a
profitable business "at this moment." Nevertheless, she has "increased benefits for everyone." Alvear has not taken a pay
cut to ensure profitability. 

 She is also a stockholder in two other adult day-care centers. She did not put up any money, only her expertise. 

 Alvear has relatives who work at Happy Years. Currently, her son Alfredo is a driver/attendant earning "about $5 an
hour." Her daughter Cynthia is a driver/activities director, but she does not know what Cynthia's salary is. Alvear's sister is
an attendant/activities director who "started probably at minimum wage and got a raise afterwards." Alvear's brother is a
driver/attendant who also started at minimum wage and got a raise. Alvear does all the hiring and decides how much to pay
each employee. 

 Alvear was paid $100 per week when Happy Years opened. She took a pay cut to come to Happy Years because of the
promise of a twenty-five percent ownership in the company. "[I]t did give me an incentive that one of these days I was part
owner of this business." She worked many more hours than forty per week. By January, 1991, she was making $200 per
week. By mid-1991, the company was profitable enough that she was paid $10 per hour. Before that, the company was
struggling. Alvear paid herself only if there were funds left over after the rest of the payroll was met. Currently, Alvear
makes $20 per hour and works about 110 hours every two weeks. She is the person in charge at Happy Years, and has been
since 1990. 

 Alvear said she removed the desk from Cantu's office because she needed it to fill out paperwork qualifying Happy Years
clients under Medicaid regulations so that Happy Years could get paid for its services. 

 Alvear has earned the money she has been paid by Happy Years because she is the manager and has to hire new directors
when they leave, which is about once a year. She also trains kitchen workers regarding food safety procedures and meal
portions. Cantu did not have the expertise in running an adult day-care center that he said he had. 

4. Testimony of Ricardo Cortez

 Ricardo Cortez, a Certified Public Accountant and businessman, testified as Cantu's expert witness on damages. Cortez
has prepared financial evaluations of businesses and has testified in approximately sixty lawsuits regarding his evaluation
of business profits. He has served several times as a special master in cases involving business disputes. He is familiar
with audit procedures, and has previously worked with adult day-care businesses. He has vast experience working with
closely-held corporations, such as Happy Years. 

 Cortez arrived at his opinion in this case by examining Happy Years' corporate income tax returns for the fiscal years 1991,
1992, 1993, 1994, 1995, and 1996. He also examined "cost reports" that Happy Years submitted to the state for the years
1994, 1995, and 1996. The state requires that all adult day-care centers file "cost reports" containing statistical information
on: (1) the number of days they are open, (2) the number of clients they have served, (3) the amount of revenue they have
received, (4) the expenses they have incurred, and (5) the fixed assets they own. Cortez was asked: (1) to formulate the
current value of Happy Years(6) and (2) to determine discretionary profits of the business from its inception. 

 Cortez testified that dividends are paid to corporate stockholders out of corporate profits. The board of directors decides
when to pay a dividend, and how much the dividend will be. Happy Years was profitable over the last six years. Happy
Years' financial documents indicate it was "a very good business." It had many clients and stability in normal expenses,
which are those that are incurred in running a business. Discretionary expenses are non-essential expenses, such as
purchasing a new vehicle instead of a used one. 

 In the last six years, Happy Years reported taxable income in three years, and a loss in three years. Cortez opined: 

It was obvious to me because of the comparability of the revenues and the normal expenses that there was [sic] a lot of
discretionary expenses being incurred by this company that would explain why some years you would have a loss and some
years you would have a profit. 



Cortez saw discretionary expenses in the "fluctuation of compensation to owners and owners' relatives." He considered
compensation the corporation paid to Alvear's relatives, known as "related-party compensation," to be discretionary
expenses. The total of such compensation was $85,955 in 1994, $65,670 in 1995, and $108,104 in 1996. According to
Cortez, the fluctuation in these amounts showed that these were discretionary expenses. 

 Cortez testified that the owners of a corporation determine how much profit it will make by deciding how much the
corporation is allowed to spend. If there are no profits, actual dividends cannot be paid. In this case, the related-party
compensation went to Rivas, Guerra, Alvear, and Alvear's son, daughter, brother and sister. These amounts reduced the
corporation's profits. 

 In a closely-held corporation, a stockholder can receive constructive dividends. For example, if a stockholder receives a
Lexus as his company vehicle when a Volkswagen would do, that is a constructive dividend. Cortez determined that
Happy Years had given constructive dividends, but he could not determine the actual amount: 

Well, I have to estimate because I don't have the underlying records. I didn't see check by check and things like that so I
have to go on experience of and my knowledge of day-care centers. And I estimated that to be, from the period from
inception to March 31 of 1997, approximately $405,000. 



 Cortez arrived at the $405,000 figure by taking gross income and subtracting what he considered normal expenses.
Happy Years had retained earnings as of March 31, 1996, the last date for which he has data, and also had outstanding
loans to stockholders of $70,360. 

 On cross-examination, Cortez testified that only a board of directors has the discretion to declare a dividend, and a
stockholder has no automatic right to be a director. In 1994, Rivas may have been paid $7,000 in director's fees, and
Guerra may have been paid $7,500. From the documentation he was provided, Cortez was not sure these amounts had
actually been paid. He found no record indicating that Alvear ever received any director's fees. 

 Cortez admitted there is nothing illegal about a stockholder's relatives working for a corporation. Adult day-care centers
are all incorporated, and all are family-owned businesses. The state requires such a center to have one employee for every
eight clients. However, Cortez would not expect a company such as this to have legal expenses of $6,000 for 1993, 1994,
and 1995. 

 According to Cortez, "when you put all the years together . . . it's my opinion, based on the information I have, that the net
profit of this entity would have been approximately [$]405[,000] considering only normal and necessary expenses." Cortez
could not break it down year-by-year as to where the undeclared dividends were, "not with the limitations of the records
that I have." According to Happy Years' federal income tax returns, its reported income during that time period was
approximately $85,000. Cortez estimated that corporate profits were approximately $320,000 more than what was actually
reported. 

 Under generally accepted accounting principals (GAAP), there must be numbers to support whatever is reported as
income. Cortez admitted that his estimate of $405,000 did not comport with GAAP standards. When Cortez was asked: 

Q. So your numbers do not agree with the federal government and your number does not agree with the generally accepted
accounting principles? 



He answered: 



A. That's correct. . . . I have given [the jury] my opinion based on my experience and my analysis of the numbers. You
may not like it, but that's my opinion. 



 Cortez admitted that tax forms may not reflect actual necessary expenses in any given year because of I.R.S. depreciation
rules. Under those rules, a taxpayer may not be able to deduct all the expenses he actually incurred in the year of purchase
of some items (such as vehicles). 

 Of the $320,000 discretionary profit that Cortez calculated, related-party compensation accounted for approximately
$260,000. If a company needs a van driver, there is nothing wrong with hiring a family member to drive the van; however,
his salary would be reported as related-party compensation. Wages are discretionary. It is acceptable to hire a relative, but
if you pay that relative more than the going rate, "that may not be okay." Alvear's son, Fred, was paid $9,500 in 1994 as a
driver/attendant. That was "probably not" overcompensation. 

 Alvear's daughter, Cindy Ruiz, was paid $11,300 as a receptionist. That would be overcompensation "if she wasn't
needed." Cortez testified: 

Q. Do you have anything to show that this was over compensation? 



A. Well, if I compare Happy Valley Years [sic] with other day-care centers, with similar income and similar in expenses,
the expenses of Happy Valley Years [sic] would be in excess -- in excess of others in a comparable situation. 



Q. That wasn't anything near my question. 



A. I'm sorry. 



Q. Are you -- 



A. I misunderstood. 



Q. The other day-care centers that you are familiar with don't have telephones? 



A. Yes, sir, they do. 



Q. They don't have anybody that picks up the phone and answers it? 



A. Yes, sir, they do. 



Q. They don't have to pay that person to pick up and answer it? 



A. Well, that may be an attendant, that may be a nurse, that may be the administrator. That may be anybody in the facility. 



Q. But they got to pay somebody? 



A. Well -- 



Q. Are you saying that roughly $900 a month it's just way too much for a receptionist? 



A. If she's needed, maybe no; if she is not needed then, well, yeah. 



 Cortez testified he arrived at the $405,000 in discretionary income as follows: 

 What I did is I went year by year and I subtracted the difference of what I thought that each year should have made based
on the gross income that it had. And I went from year 1992, I said the company would have made 30,000; '93, 40[,000];
'94, 65[,000], and from '95, '96 and '97, 70,000. That's why your math over here is skewed because you're not including '97
which I did include '97 in my [figure of] 405[,000]. And if I look at the tax returns, I'll look at retained earnings, retained
earnings from $67,000, loans to officers are $80,000, so there's zero, zero retained earnings, the difference is $405,000. 



 Loans to shareholders and officers may be deemed constructive dividends by the internal revenue service if a company is
audited. However, loans to shareholders have nothing to do with calculation of the company's profits, except that any
interest paid on the loans would be corporate income. Cortez included the $73,000 loan amount in his $405,000 figure
"because that's no longer in the corporation, that's in the pockets of the shareholders that took it out," even though the note
is still a corporate asset. If the amount of the loan was still in the corporate bank account, Cortez would have to lower the
$405,000 estimate by that amount. 

 Alvear's salary was part of the $320,000 difference between reported earnings and what Cortez estimates the profits should
have been. The cost reports show how many hours she worked. He has no documentation of what Alvear was paid in 1990
or 1991. He determined she was overpaid, but could not say by how much: 

That's a good question. The owners of a corporation obviously have discretion as to what to pay. The fair market value of
the services that you provide is that you can get anybody else to do similar services so the -- value of the similar service by
another person would roughly approximate between [$]24[000] to $30,000. 



Cortez also admitted there was a mistake in his calculation. He added the amount for 1995 twice. There is "an extra . . .
[$]70,000 that should not be in there because of the error." 

C. Standard of Review

 When we review the legal sufficiency of the evidence, we must consider all of the record evidence in a light most
favorable to the party in whose favor the verdict has been rendered, and indulge in that party's favor every reasonable
inference deducible from the evidence. Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d
41, 48 (Tex. 1998); Hines v. Comm'n for Lawyer Discipline, 28 S.W.2d 697, 701 (Tex. App.--Corpus Christi, no pet.). A
legal sufficiency point may only be sustained when the record discloses: (1) a complete absence of evidence of a vital fact;
(2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact;
(3) the evidence offered to prove a vital fact is no more than a mere scintilla; and (4) the evidence established conclusively
the opposite of the vital fact. Juliette Fowler Homes, Inc. v. Welch Assoc., 793 S.W.2d 660, 666 n. 9 (Tex. 1990). If there
is more than a scintilla of evidence to support the finding, the legal sufficiency challenge fails. Formosa Plastics, 960
S.W.2d at 48; Stafford v. Stafford, 726 S.W.2d 14, 16 (Tex. 1987). When the evidence offered to prove a vital fact is so
weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is not more than a scintilla
and, in legal effect, is no evidence. Kindred v. Con-Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983). The test for the
application of this no evidence/scintilla rule is: if reasonable minds cannot differ from the conclusion, then the evidence
offered to support the existence of a vital fact lacks probative force, and it will be held to be the legal equivalent of no
evidence. Id.; Hines, 28 S.W.2d at 701.

 When we review the factual sufficiency of the evidence, we consider, weigh and examine all of the evidence, whether it
supports or undermines the finding of the trier of fact. Plas-Tex, Inc. v. United States Steel Corp., 772 S.W.2d 442, 445
(Tex. 1989). We review the evidence, keeping in mind that it is the jury's role, not ours, to judge the credibility of the
evidence, to assign the weight to be given to testimony, and to resolve inconsistencies within or conflicts among the
witnesses' testimony. Corpus Christi Teachers' Credit Union v. Hernandez, 814 S.W.2d 195, 197 (Tex. App.--San Antonio
1991, no writ). We then set aside the jury's finding only when we find that the evidence standing alone is too weak to
support the finding or that the finding is so against the overwhelming weight of the evidence that it is manifestly unjust and
clearly wrong. Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965). 

D. The Happy Years Appeal

 

 In its first issue, Happy Years complains the evidence is legally and factually insufficient to support the jury's finding in
Question No. 1 that an agreement existed between Happy Years and Cantu that Cantu would be employed as executive
director at a salary of $2,500 per month. Happy Years contends there is no evidence in the record that it ever ratified a
pre-incorporation agreement Cantu had with Rivas. 

 The powers of a corporation are exercised by and through its board of directors. Tex. Bus. Corp. Act Ann. art. 2.31
(Vernon Supp. 2000); see also Hoggett v. Brown, 971 S.W.2d 472, 491 (Tex. App.--Houston [14th Dist.] 1997, no pet.).
The record reflects that Happy Years' board of directors agreed to pay Cantu a salary. When Rivas's attorney asked him: 

And what had you and the other members of the board of directors, what had you all agreed was going to happen in regards
to Mr. Cantu's salary? 



Rivas replied: 



We had all agreed that once the company, or the entity was operating and producing enough money, we would be glad to
give him these $2,000. But not until then. I mean there was a lot of money involved and it could not afford it. 

 

 Rivas testified that the board of directors had agreed to pay Cantu a salary of $2,000 per month. Cantu testified
extensively that the agreement was for $2,500 per month. Obviously, the jury chose to believe Cantu's version. It is the
jury's role, not ours, to judge the credibility of the evidence, to assign the weight to be given to testimony, and to resolve
inconsistencies within or conflicts among the witnesses' testimony. Corpus Christi Teachers' Credit Union, 814 S.W.2d at
197. 

 We hold the evidence is legally and factually sufficient to support the jury's finding that Happy Years agreed to pay Cantu
$2,500 per month to act as its executive director. Happy Years' first issue is overruled. 

 In its second issue, Happy Years contends the evidence is legally and factually insufficient to support the jury's finding in
Question No. 5 that Happy Years agreed to award Cantu twenty-five percent of its stock if Cantu fulfilled his obligations
under the agreement. At trial, neither appellant disputed that such an agreement existed. Rivas and Alvear testified that the
agreement did exist, but contended that Cantu did not fulfill his obligations under the agreement. Cantu testified as to the
existence and terms of the agreement, and that he had fulfilled his end of the bargain. 

 We hold the evidence is legally and factually sufficient to support the jury's finding. Happy Years' second issue is
overruled. 

 In its third and fourth issues, Happy Years complains the trial court erred in granting Cantu a judgment against Happy
Years because there is no evidence, or insufficient evidence, to support the court's "implied" finding that a breach of
contract occurred. Specifically, Happy Years contends: 

[t]he Court erred when it implicitly found that Appellant's breach of contract was a proximate cause of a pecuniary loss to
Appellee, because there is no evidence, or in the alternative, insufficient evidence, to support these findings. 



 The jury found that Cantu's damages from Happy Years' breach of the salary agreement were $25,000. The trial court later
reduced this amount by the amount of salary Happy Years had already paid Cantu. This finding is supported by Cantu's
testimony. 

 The jury also found that Cantu should be awarded fifty percent ownership of Happy Years, later reduced by the trial court
to twenty-five percent. This finding is supported by the testimony of Cantu, Rivas and Alvear, who all testified the board
of directors had agreed that Cantu would receive that percentage of stock upon completion of his duties under the
agreement. Accordingly, Happy Years' third and fourth issues are overruled. 

 In its sixth issue, Happy Years contends the trial court erred "in granting Appellee judgment against Happy Years, Inc. for
Breach of Contract because there are no pleadings to support said judgment." 

 At the time of trial, Cantu's live pleading was Plaintiffs' First Amended Petition. Paragraph 48 of Plaintiffs' First Amended
Petition states: 

48. Alternatively, if [Cantu] did not have an express or implied contract in fact then an agreement implied in law arose
whereby [Cantu] is entitled to the reasonable value of such sums in order to prevent an injustice. 



This portion of the petition follows a long recitation of facts in which Cantu asserts, inter alia, that he had an agreement
with Happy Years regarding a twenty-five percent ownership in the company and a salary of $2,500 per month, and that
Happy Years did not perform its end of the agreement. 

 It is true, as Happy Years contends, that pleadings must give fair and reasonable notice of the claims asserted. See Tex. R.
Civ. P. 47;SmithKline Beecham Corp. v. Doe, 903 S.W.2d 347, 354 (Tex. 1995);Garner v. Corpus Christi Nat'l Bank, 944
S.W.2d 469, 476-77 (Tex. App.--Corpus Christi 1997, writ denied). However, an appellate court should uphold a petition
containing a cause of action that a person may reasonably infer from what is specifically stated, even if an element of the
cause of action is not stated. SmithKline, 944 S.W.2d at 476;Boyles v. Kerr, 855 S.W.2d 593, 601 (Tex. 1993). We hold
that Cantu sufficiently pleaded a cause of action for breach of contract against Happy Years. 

 Further, even if a cause of action for breach of contract had not been sufficiently pleaded, the issue of breach of contract
was tried without objection. When issues not raised by the pleadings are tried by express or implied consent of the parties,
they shall be treated in all respects as if they had been raised in the pleadings. Tex. R. Civ. P. 67;see also Roark v.
Stallworth Oil & Gas, Inc., 813 S.W.2d 492, 495 (Tex. 1991). The party who allows an issue to be tried by consent and
who fails to raise the lack of a pleading before submission of the case cannot later raise the pleading deficiency for the first
time on appeal. Roark, 813 S.W.2d at 495. 

 The record shows that neither Rivas nor Happy Years ever objected on the ground that a cause of action for breach of
contract had not been pleaded by Cantu. For example, at the beginning of voir dire, Cantu's attorney told the jury panel,
"One of the things this case essentially involves it's [sic] a contract dispute. . . . " Appellants did not object. In fact, during
voir dire, appellants' attorney told the jury panel: 

[I]t's a contract case. And contracts basically deal with -- with one thing. Those are promises. We can -- we can have
contracts both orally, we can have them verbally -- in written form they're both all [sic] binding . . . . 



At no time did appellants claim that Cantu had not pleaded a breach of contract action. In fact, appellants defended
themselves on the theory that Cantu did not perform his part of the contract. Happy Years' sixth issue is overruled. 

 In its fifth issue, Happy Years contends that Cantu's claims against it are barred by the statute of frauds. In support of this
contention, Happy Years cites the version of section 8.319 of the Texas Business & Commerce Code in effect at the time of
the agreement, which generally requires that for a contract for the sale of securities to be enforceable, it must be in writing.
Acts 1983, 68th Leg., R.S., ch. 442, § 1, 1983 Tex. Gen. Laws 2511 (repealed by Acts 1995, 74th Leg., R.S., ch. 962, § 1,
1995 Tex. Gen. Laws 4760, effective September 1, 1995). 

 This issue must fail because Happy Years did not assert the statute of frauds at trial. While it did plead the affirmative
defense of the statute of frauds (in addition to accord and satisfaction, fraud, illegality, laches, payment, release, waiver and
limitations), Happy Years utterly failed to raise the issue at trial, failed to request a jury question concerning the statute of
frauds, and failed to object to the lack of such a question in the court's charge. Other than pleading the statute of frauds,
Happy Years did not raise this defense until the trial court's hearing on post-judgment motions. At that hearing, the
following occurred: 

Cantu's counsel: Judge, regard [sic] to the statute of fraud argument, you, know, that is an affirmative defense which they
have the burden if they really believe that, you know, that's something you need to submit to the jury and got a ruling from
the jury. They failed to do that. As a result, I mean that I don't see why we're hearing this. 



The Court: Was there -- did you make an objection to that portion of the charge? 



Cantu's counsel: No objection whatsoever, Judge. It wasn't offered to the court. There was no objection on it. It was never
brought up -- 



The Court: Yes. 



Cantu's counsel: -- at the last hearing. This is the very first time we've ever heard of this. 



Appellants' counsel: No, there's no objection to the charge that was under the statute. They had the duty to prevent -- to
present -- they had the burden on that issue because they didn't meet their burden. They're not entitled to an -- 



The Court: I'm going to deny it. 



 We hold that Happy Years waived the affirmative defense of the statute of frauds, and that Happy Years cannot raise it for
the first time on appeal. See Tex. R. App. P. 33.1.(7) Happy Years' fifth issue is overruled. 

E. Rivas's Appeal

 By his tenth issue, Rivas contends the judgment against him must be reversed and rendered in his favor because Cantu's
claims are barred by the statute of frauds. 

 As we discussed above, neither Happy Years nor Rivas asserted the affirmative defense of the statute of frauds at trial. We
hold that Rivas waived the affirmative defense of the statute of frauds, and that Rivas cannot raise it for the first time on
appeal. See Tex. R. App. P. 33.1. Rivas's tenth issue is overruled. 

 In his first issue, Rivas complains the evidence is legally and factually insufficient to support the jury's finding in Question
No. 10 that Rivas committed fraud against Cantu. In his second, third, fourth, fifth, and sixth issues, Rivas contends the
evidence is legally and factually insufficient to support each element of fraud. 

 A fraud cause of action requires a material misrepresentation, which was false, and which was either known to be false
when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon,
and caused injury. Formosa Plastics, 960 S.W.2d at 47 (citing Sears, Roebuck & Co. v. Meadows, 877 S.W.2d 281, 282
(Tex. 1994)). A party's mere failure to perform a contract, standing alone, is not evidence of the requisite intent. Crim
Truck & Tractor Co. v. Navistar Inter. Transp. Corp., 823 S.W.2d 591, 596-97 (Tex. 1992). The promisor's denial that any
promise was ever made is a factor in showing lack of intent. Hoechst Celanese Corp. v. Arthur Bros., Inc., 882 S.W.2d
917, 925 (Tex. App.--Corpus Christi 1994, writ denied). However, the subsequent acts of the promisor may be scrutinized
to infer intent. Hill v. Heritage Resources, Inc., 964 S.W.2d 89, 104 (Tex. App.--El Paso 1997, no writ). 

 Cantu testified that Rivas initially represented that he and Cantu would each receive a fifty percent ownership interest in
the day-care business. In reliance on this representation, Cantu set about obtaining the required license and remodeling an
old warehouse to meet state specifications for adult day-care centers. Rivas's intent not to perform the representations he
made to Cantu can be inferred from his subsequent actions: (1) forcing two more partners on Cantu at the last minute, (2)
refusing to vote that Cantu be paid the promised salary, (3) forcing Cantu out of the business, (4) refusing to see that the
stock certificates were issued upon Cantu's request, and (5) refusing to meet with Cantu when requested to do so. The
testimony at trial also showed that Cantu was damaged by his inability to obtain his twenty-five percent ownership in the
corporation and by not being paid according to the agreement. 

 We hold the evidence is legally and factually sufficient to support the jury's finding that Rivas committed fraud against
Cantu. We overrule Rivas's first, second, third, fourth, fifth, and sixth issues. 

 In his seventh issue, Rivas complains the evidence is legally and factually insufficient to support the jury's award of actual
damages "because there is no evidence of direct fraud damages, and there is neither pleading nor evidence of consequential
damages." Specifically, Rivas challenges the reliability of Cortez, Cantu's expert witness on damages. 

 Texas recognizes two measures of direct damages for common-law fraud: (1) the out-of-pocket measure and (2) the
benefit-of-the-bargain measure. Formosa Plastics, 960 S.W.2d at 49; Arthur Andersen & Co. v. Perry Equip. Corp., 945
S.W.2d 812, 817 (Tex. 1997); W.O. Bankston Nissan, Inc. v. Walters, 754 S.W.2d 127, 128 (Tex. 1988). The out-of-pocket
measure computes the difference between the value paid and the value received, while the benefit-of-the-bargain measure
computes the difference between the value as represented and the value received. Formosa Plastics, 960 S.W.2d at
49;Arthur Andersen, 945 S.W.2d at 817. 

 In his pleadings, Cantu claimed that Rivas had committed fraud against him, and that as a result, he had suffered damages
of "loss of agreed wages, loss of value of stock, lost profits [and] mental anguish." Clearly, the measure of damages in this
case is the benefit-of-the-bargain measure. 

 Consequential fraud damages, such as foreseeable profits from other business opportunities lost as a result of the
fraudulent misrepresentation, may also be awarded if properly pleaded and proved. Formosa Plastics, 960 S.W.2d at
49;Arthur Andersen, 945 S.W.2d at 817. The record reflects that consequential damages were not pleaded or proven at
trial, they were not the subject of a jury question, and they were not found by the jury. 

 At trial, Cantu claimed his fraud damages were the amount of constructive dividends Rivas and the other Happy Years
shareholders had received from the corporation. As we discussed above, a constructive dividend occurs when an
expenditure is made by a corporation for the personal benefit of a stockholder, or corporate-owned facilities are used by a
stockholder for his personal benefit. Hillsboro Natl' Bank v. Comm'r of Internal Revenue, 460 U.S. 370, 392 (1983);Ireland
v. United States, 621 F.2d 731, 735 (5th Cir. 1980). In determining whether a constructive dividend has been made, the
crucial concept is that the corporation conferred an economic benefit on the stockholder without expectation of repayment. 
Ireland, 621 F.2d at 735; United States v. Smith, 418 F.2d 589, 593 (5th Cir. 1969). 

 Cortez testified that a constructive dividend occurs when excessive compensation is paid by a corporation to family
members of corporate stockholders. A constructive dividend does not occur automatically when a stockholder's family
member works for the corporation, but only when that relative is overcompensated. Cortez further testified that, based on
his experience with adult day-care businesses, Happy Years had too many discretionary expenses, and the amount it paid
out as salary was too high. However, Cortez did not show that: (1) Alvear's relatives failed to perform the jobs for which
they were paid, (2) the jobs they performed were unnecessary to the corporation, or (3) the compensation they received was
unreasonably high. In fact, Cortez testified that Fred Alvear's $9,500 annual salary as a driver/attendant was "probably not"
overcompensation. He testified that Cindy Ruiz's $11,500 annual salary as a receptionist would constitute
overcompensation "if she wasn't needed." However, we find no evidence in the record that a receptionist was not needed at
Happy Years. 

 The jury based its fraud damages finding on Cortez's calculation of the constructive dividend allegedly received by Alvear,
which consisted primarily of compensation received by her family members. Because we find more than a scintilla of
evidence of a constructive dividend, we hold the evidence is legally sufficient to support the jury's finding. However,
because we find that the evidence, standing alone, is too weak to support the finding, we hold the evidence is factually
insufficient to support the jury's finding. Accordingly, we sustain Rivas's seventh issue. 

 Because we have sustained Rivas's seventh issue, we need not address his eighth, ninth, and eleventh issues. See Tex. R.
App. P. 47.1. 

 We affirm the trial court's judgment against Happy Years. We reverse the trial court's judgment against Ruben Rivas and
remand that cause to the trial court for a new trial. 





 FEDERICO G. HINOJOSA 

 Justice 





Dissenting Opinion by Chief Justice Robert J. Seerden. 



Publish. Tex. R. App. P. 47.3 



Opinion delivered and filed this 

the 21st day of December, 2000. 

1. The trial court later reduced this amount to twenty-five percent.

2. Happy Years successfully moved to have the amount of actual damages awarded by the jury for back pay reduced by the
amount of wages Cantu was paid.

3. The arduousness of the licensing procedure was further established by Ezequiel Salazar, a former Texas Department of
Human Services (DHS) contract specialist who conducted state licensing inspections of adult day-care centers.

4. Rivas and Happy Years disputed Cantu's qualifications to serve as the director of an adult day-care center. The evidence
adduced at trial shows that during the relevant time period, Cantu was qualified to serve as the director. State regulations
were later changed and required an adult day-care facility director to have a college degree, which Cantu did not have.

5. Rebecca Gonzalez, a former Happy Years employee, testified that Alvear made it clear that she, not Cantu, was in charge
of the business. Ninfa Tijerina, another former employee, testified that Alvear called her before Cantu quit and told her to
be ready to assume the director's duties at Happy Years. Tijerina thought Alvear was trying to "force out" Cantu. Tijerina
testified that Alvear, Rivas and Guerra avoided meeting with Cantu after he quit.

6. Appellants objected to Cortez's testimony about the current value of Happy Years on the ground that it was not relevant
to any of the damages sought (a twenty-five percent ownership of the corporation, a share of any actual or constructive
dividends paid to shareholders, and back pay), and that a forced partition could not be awarded. The trial court did not
allow testimony regarding the current value of Happy Years. 



 Appellants also objected to Cortez's testimony on the ground that Cantu had not complied with appellant's discovery
request for the production of all testifying expert witness reports. Cantu responded that appellants had not deposed Cortez,
although they knew of his existence for over six years before the trial, and that appellants had provided Happy Years' tax
returns and cost reports only days before the trial. The trial court allowed the documents prepared by Cortez to the extent
that they summarized evidence already before the court (the tax returns and cost reports). 



 Appellants further objected that constructive dividend damages had not been pleaded, and moved to strike Cortez's
testimony regarding them. The trial court overruled this objection.

7. Furthermore, even if this issue had somehow been preserved for our review, the section of the Texas Business and
Commerce Code appellants rely on states that a contract for the sale of securities must be in writing to be enforceable
unless: 

the party against whom enforcement is sought admits in his pleading, testimony, or otherwise that a contract was made for
sale of a stated quantity of described securities at a defined or stated price. 

Acts 1983, 68th Leg., R.S., ch. 442, § 1, 1983 Tex. Gen. Laws 2511 (repealed by Acts 1995, 74th Leg., R.S., ch. 962, § 1,
1995 Tex. Gen. Laws 4760, effective September 1, 1995). Rivas and Alvear both testified that Cantu was to receive
twenty-five percent of the corporation for helping start it up. They did not dispute the terms of the agreement. They
disputed only Cantu's compliance with the agreement.






NUMBER 13-97-790-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI

 _____________________________________________________________________ 



RUBEN RIVAS AND HAPPY YEARS, INC. , Appellants, 



v.

 

CASIMIRO (CASEY) CANTU, Appellee.

_____________________________________________________________________ 



On appeal from the 139th District Court

of Hidalgo County, Texas.

 _____________________________________________________________________ 



DISSENTING OPINION 



Before Chief Justice Seerden and Justices Hinojosa and Yañez 

Dissenting Opinion by Chief Justice Seerden

 

 The majority concludes that the evidence adduced at trial is sufficient to support a finding of liability against Happy Years.
Additionally, without considering the 

reliability of Richard Cortez's expert testimony, the majority concludes that the evidence is factually insufficient to support
his conclusions. On each of these issues, I respectfully dissent. 

I. HAPPY YEARS' LIABILITY

 By its first issue, Happy Years complains that the evidence is legally and factually insufficient to support the finding that
an agreement existed between it and Cantu. Happy Years specifically contends that it never ratified a pre-incorporation
agreement between Rivas and Cantu. Without mentioning the theory of non-ratification, the majority opinion states that
"the record does contain evidence that Happy Years' board of directors agreed to pay Cantu a salary." The sole basis for
this conclusion was Rivas's testimony that "We had all agreed that once the company, or the entity was operating and
producing enough money, we would be glad to give him these $2000. But not until then." Relying only upon this
statement, the majority concludes that Happy Years was bound to pay Cantu $2500 per month for his services. 

A. Employment Agreement Between Cantu & Happy Years

1. Counteroffer made by Happy Years and accepted by Cantu



 This conclusion fails to account for Cantu's testimony, which is that he asked several times that Happy Years increase his
pay. Upon the opening of Happy Years, Cantu, by decision of the board of directors, was paid $200 per week. This
evidence is uncontroverted. By its very terms, that decision of the board constitutes a counter-offer made to and accepted by
Cantu. See United Concrete Pipe Corp. v. Spin-Line Co., 430 S.W.2d 360, 364 (Tex.1968) (modification of original terms
of agreement constitutes counteroffer if the modified terms are material). A modification of the offer from an alleged
$2500 per month salary to a $200 per week salary constitutes a modification of a material term of the original offer. 

 In contractual terms, Cantu offered his services to the corporation and sought payment of $2500 per month in
compensation. Happy Years chose to offer Cantu $200 per week instead. Cantu accepted that agreement. There is no
controverting evidence in the record on this matter. 

 By choosing to accept employment with Happy Years under those materially modified terms, Cantu accepted Happy Years'
counteroffer, thereby making that agreement the operative and binding agreement between the parties. See Chapman v.
Mitsui Eng'g & Shipbuilding Co., 781 S.W.2d 312, 316 (Tex. App.-- Houston [1st Dist.] 1989, writ denied); Arguelles v.
Kaplan, 736 S.W.2d 782, 785 (Tex. App.--Corpus Christi 1987, writ ref'd n.r.e.) (acceptance of counteroffer is sufficient to
create a binding agreement between the parties). Thus, as a matter of law, from the outset of the corporation's existence,
the operative agreement between it and Cantu was the agreement that Cantu would be employed as the director of the day
care centers and would be paid a salary of $200 per week, notwithstanding any understandings reached between Cantu and
Rivas. Moreover, by Cantu's acceptance of the counteroffer, the original offer was rejected. See Blackstone v. Thalman,
949 S.W.2d 470, 474 n.4 (Tex. App.--Houston [14th Dist.] 1997, no writ). Once rejected, an original offer cannot be
revived. Gasmark, Ltd. v. Kimball Energy Corp., 868 S.W.2d 925, 928 (Tex. App.--Fort Worth 1994, no writ). 

 Because there is no controverting evidence on this matter, the evidence is legally insufficient to support the conclusion that
Happy Years ever entered into an agreement with Cantu to pay him $2500 per month for services rendered. See Formosa
Plastics Corp. USA v. Presidio Eng'r & Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998) (in assessing the legal
sufficiency of the evidence, the court must consider all evidence favorable to the party in whose favor the verdict was
rendered and determine whether there is more than a mere scintilla of evidence to support the fact finder's conclusion).
Here, because there is no evidence to support the conclusion that Happy Years ever agreed to pay Cantu $2500 per month,
there is not even a mere scintilla of evidence which supports the majority's conclusion. 

2. Need for Ratification to Bind Happy Years

 An alternate theory to bind Happy Years to the purported $2500 per month agreement is ratification because, to the extent
that Cantu is party to such an agreement, that agreement was reached prior to the incorporation of Happy Years. 

 A non-existent corporation cannot have an agent and is not bound by pre-incorporation agreements absent some proof that
the corporation adopted or ratified the agreement. See e.g., Fish v. Tandy Corp., 948 S.W.2d 886, 897-98 (Tex. App.--Fort
Worth 1997, pet. denied). Here, the uncontroverted evidence, straight from Cantu, is that he presented the board of
directors with as many as six opportunities to adopt the pre-incorporation agreement and that on each occasion, the board
chose not to do so. The only evidence to suggest that any such adoption was even remotely contemplated is the isolated
statement by Rivas cited by the majority. However, that statement does not support the fact finder's conclusion of adoption
for two significant reasons: 1) Rivas's statement itself makes it clear that the board placed conditions on Cantu's salary
increase; and 2) the board, on a consistent basis, expressly chose not to adopt the agreement by its vote. There is nothing in
this record to suggest that any of the directors were unreasonable in concluding that the corporation had not yet attained
sufficient profitability to warrant Cantu's pay raise. Moreover, Cantu neither pleaded nor proved that the board's decision
was a violation of the business judgment rule or justification for piercing the corporate veil. Thus, as a matter of law, there
is nothing in the record which shows that the corporation undertook any acts to bind itself to this pre-incorporation
agreement. 

3. Actions of the Board of Directors Conclusively Show No Ratification

 The testimony cited by the majority is persuasive; however, the conclusion reached by the majority, based on this
testimony alone, fails to account for the unfulfilled conditions imposed by Rivas and the other directors as a predicate for
increasing Cantu's salary. Rivas testified that "once the company . . . was operating and producing enough money, we
would be glad" to pay Cantu an increased salary. This statement, while evidencing some future willingness to increase
Cantu's salary, nevertheless expressly states the board of directors' requirement that the corporation make sufficient money,
in the board's opinion, to justify that raise. The actions of the board of directors, as illustrated by testimony in the record,
demonstrate that the Board had not yet concluded that the corporation was making sufficient money to justify the raise. 

 Cantu himself testified that at various times during his employment at Happy Years, he proposed to the Board of Directors
that his salary be increased. Cantu recalled that the board would meet once a week. During these meetings, Cantu said he
felt that the corporation was making money and that he was entitled to a salary increase, and reiterated that he felt he had
been promised $2500 per month. The remaining directors called for a vote of the board. Cantu testified that on as many as
six different occasions, the board voted three to one against increasing his salary. 

 The powers of a corporation are exercised by and through its board of directors. Tex. Bus. Corp. Act. Ann. art. 2.31
(Vernon Supp. 2000). The act of the majority of the directors present at a meeting at which a quorum is present shall be the
act of the board of directors. Tex. Bus. Corp. Act. Ann. art 2.35 (Vernon Supp. 2000). Thus, when the majority of the
board of directors chooses a particular course of action, that decision is deemed to be the act of the corporation. Here, the
board of directors, by Cantu's own recollection, voted six different times to deny his request for a pay raise. That is the
unequivocal determination of the board of directors and comports with Rivas' statement that Cantu would not receive any
pay increase until the board believed the corporation was making sufficient money to support such an increase. 

 Moreover, the record does not support the majority's conclusion that Happy Years was not bound to follow the statutory
corporate formalities because it acted as a closely-held corporation. See generally Tex. Bus. Corp. Act. Ann. art. 12.37(F)
(Vernon Supp. 2000). In order to qualify as a closely-held corporation, the articles of incorporation must specifically set out
that the entity is incorporated as a close corporation. Tex. Bus. Corp. Act Ann. art. 12.11(A) (Vernon Supp.
2000).(1)Regardless of the wishes of the incorporators, the record here clearly shows that the articles of incorporation
denominate Happy Years as a corporation, not a closely-held corporation. 

 The failure of the Happy Years' board of directors to formally adopt the agreement between Rivas and Cantu negates any
claim of ratification. Additionally, the repeated vote of the board to deny Cantu his sought-after pay increase is
overwhelming evidence that the corporation did not take any action to ratify any agreements made between Rivas and
Cantu. 

 Because I would conclude that there is no evidence in the record to support the majority's conclusion regarding a purported
agreement between Cantu and Happy Years, I would sustain Happy Years' first issue.(2) 

B. Stock Agreement Between Cantu & Happy Years

 By its second issue, Happy Years contends the evidence is legally and factually insufficient to support the finding that it
agreed to award Cantu 25% of its stock if Cantu fulfilled his obligations under the agreement. The majority concludes that
there was no dispute that such an agreement existed and that the jury chose to accept Cantu's assertions that he had fulfilled
his obligations under that agreement. 

1. Lack of Pleadings

 The majority fails to disclose that there are no pleadings in the record requesting that Happy Years issue stock to Cantu. I
would conclude that in the absence of pleadings to support the award, the trial court erred by ordering Happy Years to
issue stock to Cantu. See Tex. R. Civ. P. 301 (judgment of the trial court shall conform to the pleadings). 

2. No Ratification, No Agreement

 Furthermore, because I would conclude that Happy Years was not obligated to pay Cantu a salary of $2500 per month, I
would likewise conclude that Happy Years was not obligated to issue stock to or repurchase the stock owned by Cantu. The
agreement regarding the stock in Happy Years is not an agreement between Happy Years and Cantu; it is an agreement
between Rivas and Cantu. As a matter of law, it cannot be anything else, regardless of the conclusion reached by the jury.
As noted above, Happy Years did not undertake any actions to expressly or implicity ratify or otherwise adopt this
agreement; in fact, it counteroffered to Cantu with materially different terms and Cantu accepted that counteroffer. Any
subsequent corporate decision to give Cantu stock would have to be made by the board of directors. See Tex. Bus. Corp.
Act Ann. art. 2.35 (Vernon Supp. 2000). There is no evidence in this record which indicates that the board of directors
made such a decision. Thus, there is not legally sufficient evidence to support the finding that the corporation agreed to
award Cantu any stock. 

 I would conclude that there is no evidence that Happy Years entered into an agreement with Cantu to award him any
stock.(3) 

C. Conclusion as to Happy Years

 Because I would conclude that there is no evidence to substantiate any agreements between Happy Years and Cantu, I
would reverse the judgment of the trial court, as it relates to Happy Years, and render judgment that Cantu take nothing. 



II. RELIABILITY OF RICHARD CORTEZ'S EXPERT TESTIMONY

 Although I agree with the majority in its disposition of Rivas's appeal, I dissent from the majority's implicit conclusion that
Richard Cortez's testimony is reliable. 

 Cortez testified that he examined all of Happy Years' financial reports. He testified that his review of these records
indicated that Happy Years's aggregate profit could have been much greater. Cortez opined that Happy Years had
excessive discretionary expenditures, including related-party compensation and purchases of unnecessary equipment.
Cortez also cited what he concluded were non-business related expenses: the purchase of a Lexus automobile and the
payment of country club fees. Deducting these unnecessary expenditures, Happy Years' profit increased to $405,000(4) over
the relevant time period. He agreed that his determination was an estimate, made to calculate what he termed a
"constructive dividend." (5) 

 On cross-examination, Cortez acknowledged that his conclusion was rooted in speculation. He agreed that his
methodology did not comport with the Generally Accepted Accounting Principles ("GAAP") and acknowledged that he
could not pinpoint the lost dividends on a year-by-year basis. He testified that he had "guessed" about certain figures in his
calculation, specifically the amount of director's fees paid to both Rivas and Guerra between 1991 and 1994. He stated that
he had no records available to determine how much time Alvear spent at the day care center during this time, but
nevertheless suspected that she had been grossly overpaid during Happy Years' operation. Cortez acknowledged that there
were no records to indicate that Happy Years had purchased the Lexus, and similarly agreed that the records provided no
evidence regarding the payment of country club fees out of corporate funds. Cortez acknowledged that in this particular
circumstance, the State of Texas requires adult day care centers to maintain an eight-to-one client-to-employee ratio, and
agreed that hiring qualified family members to fill those positions would not be unreasonable. Finally, Cortez stated that he
could not account for the $320,000 he alleged was misspent. 

 The reliability of an expert's opinion is a threshold question of law, particularly when the expert testifies to the extent of
lost profits(6)associated with a business. See Szczepanik v. First S. Trust Co., 883 S.W.2d 648, 649 (Tex. 1994); see
generally Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993); Gamill v. Jack Williams Chevrolet, 972 S.W.2d 713,
720 (Tex. 1998). Absent the hallmarks of reliability, the expert's opinion constitutes no evidence. See Merrill Dow
Pharm., Inc. v. Havner, 953 S.W.2d 706, 712-14 (Tex. 1997); E.I. du Pont de Nemours, Inc. v. Robinson, 923 S.W.2d 549,
557 (Tex. 1995). Where, as here, lost profits are at issue, the amount of lost profits need not be susceptible to exact
calculation. Szczepanik, 883 S.W.2d at 649. However, the loss must nevertheless be shown by competent evidence and
with reasonable certainty. Id. Opinions or estimates of lost profitability must, at the very least, be based upon objective
facts, figures, or data from which the amount of lost profits may be ascertained. Id. Rank speculation or guesses do not
constitute objective information. Frank B. Hall & Co. v. Beach, Inc., 733 S.W.2d 251, 259 (Tex. App.--Corpus Christi
1987, writ ref'd n.r.e.) (an award of damages based upon speculation cannot be upheld on appeal). The record must show
how the lost profits were calculated. Holt Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 84 (Tex. 1992). Our review of
the record is fact-intensive. Texas Instruments, Inc. v. Teletron Energy Management, Inc., 877 S.W.2d 276, 279 (Tex.
1994). 

 In the instant case, I would conclude that Cortez's method was insufficient to support his conclusions. Cortez's
methodology did not comport with GAAP. Instead, Cortez relied on conjecture to estimate what Happy Years' profits
should have been. These conclusions stood in stark contrast to the empirical proof of Happy Years' actual profits.
Moreover, Cortez acknowledged that he could not demonstrate where the lost profits could be found and accounted for in
any of Happy Years' financial statements. His conclusions were not the result of any particular calculation. I would
conclude that Cortez's method was unreliable and, thus, constituted no evidence. On that basis, and not the factual
insufficiency of evidence, I would sustain Rivas's seventh issue. 

CONCLUSION 

 For the foregoing reasons, I respectfully dissent from the majority's opinion. I would reverse and render a judgment that,
as to Happy Years, Cantu take nothing. 


 

ROBERT J. SEERDEN, Chief Justice 



Publish . 

Tex. R. App. P. 47.3. 



Dissenting Opinion delivered and filed 

this 21st day of December, 2000. 

 

1. A recognized exception to this rule occurs when the corporation serves as the alter ego of a shareholder. See Manpower
Corp. v. Culpepper, 802 S.W.2d 226, 228 (Tex. 1990). There is no pleading in this record to support an alter ego finding in
this case. 

2. Furthermore, because I am convinced that Happy Years' first issue should be sustained, I would also conclude that we
need not reach Happy Years' issues related to its breach of contract claims. Tex. R. App. P. 47.1. 

3. I would also conclude that we need not reach Happy Years' fifth issue related to satisfaction of the statute of frauds.
Tex. R. App. P. 47.1.

4. This number was admittedly wrong and was subsequently corrected by the trial court. 

5. It is, of course, axiomatic, that ownership of stock in a corporation does not entitle an individual to any share of profits.
See generally Tex. Bus. Corp. Act Ann. art. 2.38-1 (Vernon 1998). Instead, stockholders are entitled to a share of
dividends declared by the corporation's board of directors. However, in this case, the instruction and question submitted to
the jury concerned, inter alia, Cantu's entitlement to lost profits. Neither party objected to either the instruction or the
question. Because error was not preserved, I would not consider the propriety of either, but would proceed as though the
instruction was correct. However, this should not be taken as my approval of using lost profits as a measure of damages in
suits by shareholders against directors. 

6. Cortez explained that his calculations were for the purposes of determining a "constructive dividend" and not lost
profits. However, the record indicates that Cortez consistently refers to the $405,000 constructive dividend as lost profits.
For current purposes, I will consider these terms to be indistinguishable.